## THE CITY OF CARLISLE.

### BASQUALL v. THE CITY OF CARLISLE.

*(District Court, D. Oregon. August 20, 1889.)*

1. ADMIRALTY—JURISDICTION.
   The United States courts, as courts of admiralty, have jurisdiction of all cases of admiralty cognizance when the thing or parties are within the reach of their process, without reference to the nationality of either.
2. SEAMEN—PROTECTION—SICKNESS.
   It is the right of a seaman injured in the service of a vessel to be cared for at least to the end of the voyage, and nothing short of gross negligence or willful misconduct, causing or concurring to cause the injury, will forfeit such right.
3. SAME—LIEN FOR INJURIES.
   A seaman injured in the service of a vessel has a lien on the same for the damages he may sustain by reason of the neglect or misconduct of the officers thereof, in caring for him while affected by such injury.
4. EVIDENCE—DOCUMENTARY—LEX FORI.
   The admissibility or competency of evidence in a legal proceeding pertains to the remedy, and is governed by the *lex fori*, and therefore a clause in the British shipping act of 1854, making certain entries in the official log-book competent evidence in all courts, does not make them so in the courts of any other country.
5. ADMIRALTY—PLEADING—JOINDER OF CAUSES.
   The joinder of causes of suit not enumerated in admiralty rules 12 to 20, inclusive, are not governed thereby, but by rule 46; and, where the facts in a case establish a liability against the master and a lien on the ship for the same claim, such liability and lien may be enforced in one libel.

**6. SEAMEN--DAMAGES FOR NEGLECT.**

> On the facts found, *held*, that the master and vessel are liable to the libelant for damages for not caring for him after his injury as he was entitled to be, and for the aggravation of his injury and suffering caused thereby.

*(Syllabus by the Court.)*

In Admiralty. Libel for damages for injuries sustained, and neglect and maltreatment thereafter.

*Edward N. Deady,* for libelant.

*C. E. S. Wood* and *J. Ditchburn,* for defendant.

DEADY, J. William Basquall, a minor, by his guardian, Frederick V. Holman, brings this suit against the British bark City of Carlisle, and her master, C. D. Moore, to recover $15,000 damages, for an injury sustained by him on board said bark, and neglect and maltreatment thereafter.

The charge in the libel is shortly this: In sending the main lower topsail down on one occasion, the work was so carelessly and negligently done as to cause the starboard clew-iron thereof to strike the libelant on the head and fracture his skull; and thereafter the master failed to give or procure for the libelant such medical aid and assistance as the case required, and he "was able to give and render," and maltreated and abused him.

The master admits, in his answer, that the libelant was injured as alleged, but avers that the injury was not caused by any negligence or carelessness in lowering said sail, but by the fault and carelessness of the libelant. He denies that he failed to give the libelant such medical aid and attention as the case required, and he was able to give or render, or that he maltreated him or abused him; and avers, in effect, that the libelant was well cared for after said hurt.

Some 36 witnesses were examined,—22 by the libelant and 14 by the defendant. Among these were 11 of the officers and crew of the bark, and a number of experts who were called to testify whether or not the sail was lowered in a seamanlike manner.

The evidence from the vessel is, of course, more or less contradictory. Those of the crew who remain with the bark are called by the defendant, while those who have left her are called by the libelant.

The master, mate, second mate, steward, and two apprentices, who are in the last year of their service, testify for the vessel, while the cook, sailmaker and two apprentices, including the libelant, and a stowaway boy, testify for the libelant.

In weighing this evidence, I am constrained to believe that the master is not worthy of credit, and his testimony is of but little worth. The mate, George Dodd, impressed me favorably as a man. But he has been with his present employers, as man and boy, for a number of years, and may reasonably expect employment from them, in the near future, as a master. Under these circumstances he is strongly tempted to make as good a case as he can for the vessel, which I think he has done, without

going so far as to tell a downright falsehood. But he does not always remember when I think he might.

John A. Bebb is an apprentice in the service of the vessel's owners. He has only eight months more to serve, when, if he remains with the ship, he may be examined for a mate's certificate. I think he made up his mind that he could not testify against the ship, and go home in her with safety and comfort to himself. I am convinced that he gave altogether a different account of the matter to the libelant's attorney, when he may not have thought that he would be called as a witness, from that which he gave on the witness stand. It was indeed pitiful to see the confusion and shame on the poor fellow's face as he tried to deny or explain his former utterances.

Of the rest of the crew that remain with the bark, Harry Hart, the second mate, Thomas Noble, the steward, and George Eggert, an apprentice, nothing more need be said than this: that in giving their testimony they probably did not forget that the master had it in his power to make them very uncomfortable during the remainder of the voyage, which circumstance ought not to be overlooked in estimating the value of their evidence.

The libelant is largely interested in the result of the suit. Therefore his testimony ought to be received with caution, if not distrust. But he appears to be a simple, honest lad, and I seldom, if ever, heard one in his walk in life, or any other, testify with more apparent candor and artlessness than he did. The same may properly be said of the other three boys who testified for him, Henry Carley, the stowaway, William J. Freer, an apprentice, and Lawrence Ainsworth, an apprentice left in this port by a British vessel some months ago, and a former shipmate of the libelant in a training vessel at Liverpool.

Estimating the evidence in the light of these suggestions, I find the facts as follows:

(1) The libelant, a native of Dublin, whose parents reside at Stockport, Cheshire, having served two years and four months in the training ship Indefatigable, at Liverpool, was on September 22, 1888, at the age of 16 years, with the consent of the officers of said ship, voluntarily apprenticed to Peter Iredell & Sons, of Liverpool, for the term of four years, to learn the business of a seaman, and thereupon he was duly shipped on the bark City of Carlisle, a vessel of 204 feet in length and 37 feet beam, then and now owned by said Iredell & Sons, to serve thereon as such apprentice on a voyage from Liverpool to Portland, Or., and thence elsewhere on the Pacific coast, and back to a port of discharge in the United Kingdom.

On Monday, November 12, 1888, at 8 o'clock A. M., in latitude 24.19 S., and longitude 37.15 W., and about 6 deg. or 332 geographic miles east of Rio Janeiro, it being the first mate's watch on deck, in which were the libelant and Carley, it was determined to change the lower main topsail for a heavier one, as they were getting out of the tropics, whereupon the mate gave directions to prepare the sail to be lowered on deck, which was done by a seaman and the libelant and Car-

ley, the latter two of whom cut the robands or ropes that fastened the head of the sail to the yard, and then returned to the deck.

Under the direction of the mate the sail was clewed up or the lower corners brought up to the yard at the bunt or middle of the sail, by means of the clew-lines, the buntlines or ropes used to pull up the sail were hauled, a gantline or rope used to lower the sail was rove through a block on the crosstrees and sent down and bent around the sail and hauled taut; then the sheets and clew-lines were taken off, the earings loosed, the robands cut, and the head earings brought into the gantline and then made fast, and then the sail was lowered.

The clews when hauled up were not stopped or fastened together, and, when the clew-lines were detached from the clew-irons, the clews or lower corners of the sail fell down loose on either side of the gantline.   At this time there was from a four to a six knot breeze on the starboard quarter, and the yard was braced so as to let the sail down on the port or lee side.

Before and at the time the sail was being furled and lowered the master was on the port side of the poop overlooking the sailmaker who was preparing the sail to be sent aloft in the place of the one coming down. The libelant was standing on the starboard side of the vessel, just forward of the main hatch, and Carley was standing on the port side of the poop, assisting the sailmaker.

In lowering the sail the ship rolled, and the starboard clew got foul of the mainstay, and the mate thinking it would clear itself—be pulled over the stay by the weight of the descending sail, to the port side—allowed it to lower until he feared that if it did clear itself the clew-iron would hit the deck and mar it, when he sang out, "Hold on the gantline,"— the rope with which the sail was being lowered,—and sent the man then aloft down the mainstay to clear the clew.   Before the man went down the stay the mate sang out, "Stand clear," and just before the clew was let go—passed over to the port side of the stay—he said, "Look out there."

As the clew was being cleared from the stay the master called to Carley to tell the libelant to come aft, where he wanted him to help the sailmaker.   Carley went forward on the port side of the vessel, and told the libelant the master wanted him.   The latter started aft immediately, going quickly across the main hatch in a diagonal direction, and as he reached the after corner of the same, on the port side, the clew of the sail dropped from the mainstay, and the clew-iron, an irregular shaped ring of four or five pounds weight, fastened to the corner of the sail, struck him on the right side of the head, about two-thirds of the way from the ear to the crown, and fractured and depressed his skull, from the effect of which he fell senseless on the deck.

(3) The mate and others who were present picked libelant up and carried him to the poop, where the steward, under direction of the master, washed the wound, cut the hair away around it, put some balsam on it, bandaged it, and moistened his lips with brandy, when he was taken forward and placed in his bunk in the house on deck, and Carley set to watch him that day and during the nights following, for some three

₄₀ur weeks. During the day the master took some stitches in the wound, and this is all the personal attention he ever gave the libelant while confined to the house, except to look in the room once a day or less, and turn up his nose at the smell, and go away.

In this condition the libelant was left in an unconscious or delirious state, sweltering and rolling in his own excrement, with no regular attendant but the boy Carley at night, and such casual attention and observation as he might receive from the members of the crew during the day, until Sunday, the 18th day of November, when the master, on repeated complaint of some of the crew, permitted, rather than directed, the mate and others to wash him and put some clean burlap under him. On the next day the mate restitched the wound, the first stitches having broken out, and thereafter he was washed at regular intervals and his personal comfort in this respect reasonably cared for; but he was stinted in his food and water, and some of what he got was furnished or obtained for him by members of the crew.

(4) In about six or seven weeks from the date of his injury the libelant was "turned to" by order of the master, and kept at work on deck from 6 in the morning to 6 in the evening, for the rest of the voyage; at first making paint swabs, sennit, and then cleaning brass, scraping deadeyes, washing and sweeping decks, hauling on the braces and handling sails,—in short, all ordinary seaman's work except going aloft.

(5) The wound on the libelant's head was still a running sore when he was set to work; at the same time he had a bad bed sore on his buttock, another on his heel, and one on his ankle. On account of the latter two he could not wear his shoes, and in the tropics the hot deck burned his feet. From neglect, these bed sores got proud flesh in them, and finally, at the suggestion of one of the crew, the libelant went to the master and asked him "to burn" them, which he did with caustic, repeatedly. In so doing he made the libelant let down his trousers, while on the poop, and needlessly expose his private parts, at the same time making brutal and indecent remarks to him on the subject.

(6) In consequence of the injury to his brain, the left side of the libelant, and particularly the arm and leg, were paralyzed, so as to seriously affect the use of them during the remainder of the voyage, in addition to which his eyesight was much impaired and his perception and memory materially weakened, notwithstanding which the master required him to be on deck and at work as aforesaid, and often arbitrarily compelled him, to his great discomfort, to stand up, when the work at which he was employed admitted of his sitting down; he also habitually accosted him in a harsh, derisive, and contemptuous manner, calling him a "useless bugger," a "wastrel," and the like.

(7) On March 13, 1889, the vessel arrived at Portland, when the libelant had leave to go ashore in the evening, where he met a boy, the witness Ainsworth, whom he knew on the training ship at Liverpool, who took him to a boarding-house and saloon kept by the witness Mrs. Pauline Rosenburg, where he stayed all night. In the morning Mrs. Rosenburg took him down to the vessel, and with the assent of the mas-

ter took him back to her house for the purpose of taking care of him. His condition appears to have aroused her sympathy, and she endeavored to raise means to send him home direct, but failed. She then consulted counsel in the case, with a view of making the vessel send him home, and the result was the boy was sent to the Good Samaritan hospital, and thereafter, on March 29th, this suit was commenced.

(8) The master failed and neglected to procure or provide any medical aid or advice for the boy after the arrival of the vessel in port, and was contriving and intending to get rid of him as easily as possible.

(9) When the libelant went to the hospital his arm and leg were still partially paralyzed, and the attendant had to cut his food for him. At the trial he appeared to have improved mentally and was able to answer the questions put to him readily and intelligibly. The wound on his head had healed over. The scar is bare of hair and about three inches long and three-fourths of an inch in width, and the depression in the skull is about three-eighths of an inch. He had not recovered from the paralysis of his side, and according to the testimony of the medical expert he may never do so, but probably will on account of his youth. The doctor also thinks that the brain may accommodate itself to the depression in the skull, so that it will not be necessary or desirable to resort to the operation of trephining, but this is at least problematical.

(10) The master did nothing towards sending the libelant home at the vessel's expense, and in my judgment never intended to, and the equivocal and invalid offer made at the trial to that effect was merely made *for* effect; and the proposition to send the boy home as a passenger on the City of Carlisle, with her present master, considering the duration of the voyage and the treatment he is likely to receive in the mean time, was simply inhuman.

(11) The injury to the libelant was the result of the concurring carelessness of the vessel in lowering the sail without "stopping" the clews at the bunt thereof, and that of the libelant himself in passing directly under the sail when and as he did; but his carelessness was not of that gross character, nor was it the result of such reprehensible motives or purpose, as will forfeit his right to be kept and cured at the expense of the vessel, for he might not have perceived that the clew, when cast off the stay, would reach him, as it would not if he had been on the deck instead of the hatch, in crossing which, instead of going round in front of it, he was actuated by a laudable desire to obey the command of the master with alacrity, and get to the port side of the poop, where he understood he was wanted, by the shortest way and in the least possible time.

These are the material facts in the case. Before proceeding to state the law arising thereon, it may be well to briefly advert to the testimony in support of the last finding, for over this point the chief contention of the parties was made.

The weight of the expert testimony shows that in sending down the topsail good seamanship requires that the clews when drawn up to the bunt of the sail should be "stopped" or tied together there. The dan-

ger of sending it down with the clews loose and the clew-irons dangling about is apparent to any one who has given any attention to the subject. The evidence also shows that in good weather, when a vessel is not rolling, the sail is often sent down with the clews loose. But in such cases the vessel simply takes the chances. Then it may be said, "All's well that ends well," but otherwise not.

The libelant must have been aware of the fact that the sail was being lowered with the clews loose, and that the starboard one had swung over with the roll of the vessel and got foul of the stay. He had just come down from the yard, where he had been assisting in cutting the robands to let the sail loose therefrom. When called by the master he was standing on the deck just forward of the main hatch, and probably looking at the man on the stay casting the clew loose. He must have heard the mate's warning, though neither he nor Freer, who stood close beside him, was questioned on that point.

It is also true that the mate testifies he gave the first warning two minutes before the clew was cast off, and the second one one minute before; from which it may be claimed that the warning was given so long before the event as to be no warning at all. But in the nature of things the warning, if given at all, would be nearer the event than this. And when the mate speaks of one or two minutes from recollection, at this distance of time, he merely intends to convey the idea that it was a very short time, —only momentary.

Besides, I think it was the duty of the libelant, under the circumstances, to "look aloft" before he undertook to cross the hatch.

But, as I have found, this carelessness of the libelant is not of such a character as to deprive him of his right to be cared for and cured by the vessel. The fault which will forfeit this right must be some positively vicious conduct, such as gross negligence or willful disobedience of orders. *The Chandos*, 6 Sawy. 549, 4 Fed. Rep. 645, and cases there cited; *The City of Alexandria*, 17 Fed Rep. 390. In this latter case Mr. Justice BROWN says, (page 395:)

"The only recognized qualification of the seaman's right of recovery is where the injuries have arisen from his own gross and willful misconduct."

And in *Olson* v. *Flavel*, 34 Fed. Rep. 479, this court said:

"Where the negligence is concurrent, or both parties are in fault, courts of admiralty will apportion the damages, or give or withhold them, in the exercise of a sound discretion, according to principles of equity and justice, considering all the circumstances of the case."

Citing *The Marianna Flora*, 11 Wheat. 54; *The Explorer*, 20 Fed. Rep. 135; *The Wanderer*, Id. 140; *The Max Morris*, 28 Fed. Rep. 881; *Atlee* v. *Packet Co.*, 21 Wall. 389.

There is nothing in the case to indicate that the libelant was either a negligent or willful boy, but the contrary. He appears to have stood well in the training ship, where he held some petty office, and had made such progress that he was allowed to become an apprentice and go to sea eight months before his period of training had expired. Nor do I think that the rule applicable to an experienced seaman as to skill and pru-

dence in taking care of himself ought to be rigidly applied to a boy of 16 years of age, a few weeks at sea, on his first voyage. He was only to receive £28 for four years' service; and was there to be taught and cared for,—looked after in rather a paternal way.

The relation of master and apprentice is well recognized in the English law as imposing a peculiar responsibility on the master. Whether on land or water, he stands to the apprentice *in loco parentis;* so that the relation is not merely that of master and servant or master and seaman. As Sir HENRY HOBART said in the year 1616, in *Coventry* v. *Woodhall,* Hob. 134a:

"The matter of puting an apprentice is a matter of great trust for his dyet, for his *health,* for his *safety.* And generally no man can force an apprentice to go out of the kingdom, except it be so expressly agreed, or that the nature of the apprenticehood doth import it, as if he be bound an apprentice to a merchant-adventurer or a saylor or the like."

And although Basquall was not directly apprenticed to the master, he was to his owners, for whom he stood, and whom he represented in all this matter.

On the question of going into Rio Janeiro for surgical aid for the libelant, I do not feel warranted on the state of the evidence as to the wind, in holding that it was the absolute duty of the master to make the deviation, though I am much inclined to think he might very properly have done so. He was 6 degrees east of Rio, and, calling a degree of longitude at that point 55⅓ geographic miles, he was about 232 miles from the port. The master says it was 600 miles. In this he is certainly mistaken, and probably intentionally so. He did not say whether he meant geographic or statute miles, but probably the former. However, the distance is less than 400 statute miles. With a six-knot breeze this distance might have been made in less than two and a half days, which does not seem a great delay or sacrifice to make in a voyage of five months to save the life or mind of a boy committed to the care of the master *in loco parentis.* And later on he might have gone into Montevideo or the Falkland islands without going 100 miles out of his way. If the vessel was in need of a spar or topmast, I doubt not he would have gone into either of these ports to replace it.

As usual in these cases of suits against British vessels in this court, objection is made to the jurisdiction, because the parties and the vessel are British; and in this case because the contract sued on (the articles of indenture) is not maritime.

And first, this suit is not brought on the articles of indenture, but on a tort committed on the high seas. The articles are mere matter of inducement, by which the relation of the libelant to the ship is shown— that of an apprentice to the owner—as the shipping articles would in the case of a similar suit by a seaman. Besides, the articles of indenture are just as much a maritime contract as the shipping articles. They are both contracts executed on land to be performed on sea. *Insurance Co.* v. *Dunham,* 11 Wall. 1; Ben. Adm. § 261.

Before taking this apprentice to sea the master was required by section

145 of the British merchants' shipping act of 1854 to cause him to appear before the person before whom the crew was engaged, and there produce the indenture; and the name of the apprentice with the date of the indenture, and the name of the port at which it was registered, was then entered on the "agreement" with the seaman. Thereupon he was duly shipped as an apprentice on the City of Carlisle for the voyage mentioned in the "agreement" or shipping articles, and has the same remedy against the master or vessel for any injury or wrong sustained by him during the voyage as any other member of the crew; and this in addition to any right of action he may have against Iredell & Sons directly on the covenants in the articles of indenture.

Courts of admiralty in the United States have jurisdiction of torts committed on the high seas without reference to the nationality of the vessel on which they are committed, or that of the parties to them. Such jurisdiction will, in the discretion of the court, be declined in suits between foreigners, where it appears that justice will be as well done by remitting the parties to their home forum. But the jurisdiction will not be declined where the suit is between foreigners who are subjects of different governments, and therefore have no common forum. *Bernhard* v. *Greene*, 3 Sawy. 230; *The Noddleburn*, 12 Sawy. 132, 28 Fed. Rep. 855; *The Belgenland*, 114 U. S. 355, 5 Sup. Ct. Rep. 860; Ben. Adm. § 282.

There is no reason to decline the jurisdiction in this case. To do so would be equivalent to a denial of justice. The libelant is separated from the vessel. His condition and the circumstances justified him in leaving her; and it is highly probable that the master indirectly encouraged him to do so. The vessel is not expected to reach her home port for many months yet. And if he has a remedy on the covenants in the articles of indenture directly against the owners in England, how is he going to get there in the mean time? and when there, where will his witnesses be? The crew have all left the vessel except the officers and two apprentices, and no one can say where they will be in that time. Indeed, it is shocking to think of turning this poor helpless boy out of court in a civilized country without redress for a grievous wrong, upon the theory that he has a remedy in the courts of his own country, when it is apparent that, however just may be the laws of such country and impartial their administration, such remedy is, under the circumstances, to him utterly unavailable.

As Mr. Benedict, in discussing this question, well says, (Ben. Adm. § 282:)

"Nothing within the territory of a nation is without its jurisdiction. * * * All persons in time of peace have the right to resort to the tribunals of the nation where they may happen to be for the protection of their rights. The jurisdiction of the courts over them is complete, except when it is excluded by treaty."

The official log-book was offered in evidence for the defense, on the question of the injury to the libelant and his subsequent treatment. On objection made by the libelant, it was admitted subject thereto.

The British merchants' shipping act of 1854 provides (section 282)

that an entry shall be made by the master in the official log-book in "every case of illness or injury to any member of the crew, with the nature thereof and the medical treatment adopted, if any;" and section 285 of the same declares:

"All entries made in any official log-book as hereinbefore directed shall be received in evidence in any proceeding in any court of justice, subject to all just exceptions."

But this act does not settle the question for this court. So far as it declares the admissibility of the log-book as evidence, it is only in force in British courts. By the law of this court, the *lex fori*, the competency of evidence in a proceeding before it, must be determined, and not that of Great Britain. Whart. Confl. Laws, § 752. However, I think the book is admissible under our law, as *prima facie* evidence of the truth of the entries required by the British act to be made therein. 1 Greenl. Ev. § 495; 1 Whart. Ev. § 648.

But the entries in the log are shown to be materially untrue, and could not well have been made contemporaneous with the events to which they relate. Under no circumstances could they have any more weight, as evidence, than the master's statement on oath, as a witness, which I am constrained to consider unworthy of credit.

It is also objected that the suit "joins a libel *in personam* with a libel *in rem*." This objection comes too late on the argument. It ought to have been made, if at all, by exception to the libel before answer. And if it were well taken now, and it had any merit, the court would allow the libelant to dismiss as to the master.

I had occasion to examine this subject in the case of *The Director*, 11 Sawy. 493, 26 Fed. Rep. 708, and the conclusion there reached was that the admiralty rules, from 12 to 20 inclusive, relating to joinder of parties or causes of suit in certain cases, do not apply to cases not therein enumerated; and that such cases may be proceeded in, in this respect, under rule 46, in such manner as the court may deem expedient for the administration of justice; and also, that where the facts of the case establish the liability of the master, and give the libelant a lien on the vessel, as well, for the amount of his claim, it is proper and expedient that the proceeding against him and the vessel be joined in one libel.

This case is not within any of the admiralty rules aforesaid regulating the joinder of causes of suit, and therefore comes under rule 46. The claim of the libelant, if established, is certainly a lien on the vessel; and a suit to enforce it may include a cause of suit against the master, arising out of the same facts. *The Clatsop Chief*, 7 Sawy. 274, 8 Fed. Rep. 163; Ben. Adm. §§ 396, 397.

This I believe disposes of the case, except the question of damages.

Assuming, as I do, that it was the duty of the vessel to take care of the libelant, at least to the end of the voyage, including such medical treatment as was proper and could reasonably have been obtained, as decided in *The City of Alexandria*, *supra*, in *Reed* v. *Canfield*, 1 Sum. 195, and *The Atlantic*, Abb. Adm. 451, the damages under this head will be

confined to what is necessary to make good, as far as possible, the default of the vessel in this respect.

When the City of Carlisle arrived at Portland, the master should have sent the libelant at once to a hospital, and had him examined by some skillful and well-known physician. This would probably have resulted in trephining him, when he might have been able to continue on the voyage, but most likely not; in which case he should have been sent home direct, as soon as he was able to travel.

Measured by this rule I estimate and assess these damages as follows: Hospital expenses for five months at $1 per day, $150; expense of trephining, $150; expense of journey to Liverpool, $200;—in all $500. This includes nothing for pain, suffering, or inconvenience resulting from the injury, whether temporary or permanent. He is entitled to wages until his return home or the end of the voyage, which will be about a year. This is £6, or $30.

In addition to this, the libelant must have damages for the gross neglect and mistreatment he received after the injury, whereby his injury and suffering were much aggravated.

In *The City of Alexandria, supra*, (395,) Mr. Justice BROWN, after stating that the ship was bound for the care of an injured seaman and wages to the end of the voyage, unless the injury arose "from his own gross and willful misconduct," says:

"Misconduct or neglect by the officers in the treatment of the seaman, after he has been wounded in the service of the ship, becomes a different and additional cause of action against the ship, because a legal obligation to him then arises to afford suitable care and nursing; and, if this be neglected, the ship may be held to consequential damages."

On the ground of gross neglect and cruel maltreatment of the libelant since his injury, I estimate and assess the damages of the libelant at $1,000.

It may be said that this result is a hardship on the owners, who will probably have to satisfy the decree. That may be so, but Basquall's is much the harder lot of the two. And if owners do not wish to be mulct in damages for such misconduct, they should be careful to select men worthy to command their vessels and fit to be trusted with the safety and welfare of their crews, and particularly apprentice boys, during the long and perilous voyage from the North Atlantic to the North Pacific.

A decree will be entered in favor of the libelant for $1,530, and the costs of the suit.