## McGHEE v. UNITED STATES.

District Court, S. D. New York.
June 7, 1945.

William L. Standard, of New York City (Jacquin Frank, of New York City, of counsel), for libelant.

Hunt, Hill & Betts and James F. X. Mc-Gohey, U. S. Atty., both of New York City (Geo. Whitefield Betts, Jr., William Logan, Jr., and Helen F. Tuohy, all of New York City, of counsel), for respondent.

BRIGHT, District Judge.

Libellant, an employee of the respondent upon the S. S. Thomas Hooker, a merchant vessel owned and operated by the respondent, seeks recovery (1) of damages for personal injuries alleged to have been sustained as a result of negligence in failing to provide a seaworthy vessel, (2) for maintenance and cure, and (3) for war risk insurance benefits. Libellant withdrew and discontinued the cause of action for war risk insurance benefits at the beginning of the trial.

Plaintiff has always been a resident of Glasgow, Scotland. He was a member of the Allied Shipping Pool in Glasgow, from which is made replacement of seamen who are unable to work because of a disability, sickness or other contingency, and on December 10, 1942, signed on the Thomas Hooker as wiper. His wage was $87.50 per month, plus a bonus of $500 for a Mediterranean trip and ammunitions bonus of about $16 and another bonus for crossing the ocean, in all amounting to over $300 a month.

The Thomas Hooker was a "Liberty" ship and was launched in July, 1942, and delivered to respondent on or about August 12, 1942. She was a steel vessel, a combination of riveting and welding, the shell plates being riveted to the frame and the plates welded to each other, 411 feet long and 1776 gross tonnage. She was thoroughly inspected when completed and pronounced seaworthy for routing on all oceans. She sailed from Boston to Halifax and thence to Glasgow. On October 21, 1942, she was in collision with a barge at Gourouck, Scotland, and after temporary repairs, she was

reported seaworthy and fit to continue her voyage with a recommendation for permanent repairs. On October 25, 1942, she sailed for Oran, in Algeria. On that trip she carried cargo and 800 tons of ballast consisting of shale in numbers 2 and 3 holds. Coming back from Oran she had no cargo, only the ballast mentioned, and the trip was uneventful except that rough weather was experienced the last day or two, but nothing unusual. She landed back in Glasgow about December 5th. While in Oran on November 13 to 18, 1942, her anchor and bulwark rail was damaged when it came in contact with a crane.

McGhee, as I have said, signed on as wiper on December 10th, and the ship was in Glasgow until the 24th, on which date she sailed again for Algeria, and went to Bone. On that trip, and after entering the Mediterranean, she was under attacks by dive bombers, torpedo planes and submarines. While at or near the dock in Bone, and after discharging her cargo, a bomb fell on the dock and exploded at a distance of from 20 to 50 feet from the ship, tearing a large hole in the dock and severely shaking and vibrating the ship. A visual inspection of the starboard side of the ship was made from the dock by the captain, but no plates were found loose or injured. It does not appear that any inspection was made of the interior of the ship. At any rate, no leaks were discovered on the journey back from Bone, which was made without cargo and with only the 800 tons of ballast previously mentioned. At the time the bomb fell on the dock, another one fell in the water near the stern of the vessel and that also caused a severe shaking and vibrating of the ship. She reached Glasgow about February 1, 1942, experiencing no unusual weather and acting very well on her return trip. No inspection of the hull or shell of the vessel was made between February 1 and February 10, during which period of time she was at anchorage in the Clyde. On February 11th, she took on 500 more tons of ballast in No. 4 hold. The 1300 tons of ballast, consisting of dirt and shale and debris from bombings, was distributed, 400 tons in the No. 2 lower hold, 400 tons in the No. 3 lower hold, 300 tons in the No. 4 lower hold, and 200 tons in No. 4 'tween deck. She left Glasgow on February 11th, and proceeded toward the point where she was to meet her convoy and en route encountered rough weather, her propeller would come out of the water when she pitched, causing excessive vibration, breaking down the steering apparatus, which was repaired, but the ship put back into Glasgow for more ballast. Her steering engine was there inspected, but no inspection was made of the rest of the vessel. She took on 800 more tons of dirt ballast. The 2100 tons of ballast was then distributed 400 tons in No. 2 lower hold, 50 in the 'tween deck, 400 in No. 3 lower hold, 50 in 'tween deck, 500 in No. 4 lower hold and 100 in 'tween deck, and 500 in No. 5 lower hold and 100 in 'tween deck. The fore and aft peaks were full of 282 tons of fresh water, and the two deep tanks had in them 652 tons of fresh water. The ship also carried 200 tons of fuel oil in the deep tank, together with water ballast in Nos. 1, 2, 3 and 5 ballast tanks.

She left port on February 21st without cargo and with a draft of 14 feet forward and 22 feet aft, joined a convoy and started across the Atlantic. She encountered very bad weather all the way across. The sea was rough and a northwest wind of about 7 force was encountered. The temperature was below freezing, and leaving Glasgow the propeller was just submerged.

On the evening of March 5, 1942, an explosion was heard and upon examination being made to ascertain the cause, it was found that shell and deck plates on the deck were cracked, through the plates and not in the weldings, down the port side and across the deck to the forward part of No. 3 hatch combing, and then from the after end of that combing across the deck to but not down the starboard side. There was another crack through the deck plates about 10 feet aft of the first crack mentioned, and still another crack about 25 feet further aft in the shell of the ship on the starboard side through the store room. These cracks opened and closed as the ship was buffeted by the storm and shipped water. The captain ordered the crew to abandon ship, but later countermanded the order in view of the fact that it was dark and snowing and rough seas, and also at the suggestion of a Canadian corvette which had accompanied the convoy for protection. At daybreak the next morning, all of the crew left the ship in the life boats and were taken aboard the corvette and ultimately landed in Newfoundland. The ship was never thereafter found and obviously sank. It never could be in any port of the United States at the time the libel in this suit was filed.

The libellant testified that at the time he signed on he was a well and healthy individual and had previously engaged in laborious undertakings, both in the mines in Scotland, on ships, and in land work as a rigger and in concrete work. He says that he was required to be physically examined when signing on and that he was found fit and gave his certificate to the captain. On the day of the explosion he had been engaged in the engine room as a wiper and doing his other duties, and was dressed in a light shirt and dungarees; that he was in the crews' mess hall at the time and rushed on deck and saw the crack, that it was then very cold and below zero and stormy, and he was ordered to make search to find out what had happened and to see how far the crack extended; that he went to the store-room on the deck below the main deck and found the crack in the wall of that room, which was shipping water whenever it opened, and in that room there was already a lot of water in which he was required to stand in ascertaining the extent of the crack. When the order to abandon the ship was given, he and the rest of the crew stood at the life boat for two or three hours in the same clothes, with the addition of a sweater, and that he became thoroughly chilled and wet through. He also testified that when the order to abandon was given, the engines were shut off and that the ship became cold and that he had to endure such cold dressed in the same manner until daylight. Then he with others went in the life boats to the corvette through rough seas, spray being shipped enroute, and that he and the other 65 members of the crew were huddled together on the corvette for two days on its journey from the scene of the occurrence to Newfoundland. He was then placed in an army camp and later transferred by a cold train to a navy camp, and thence by train to Boston and Jersey City, where his parents reside. After he had gotten on the corvette and at times between then and his arrival in Jersey City, he had a tight sensation in his chest. While in Jersey City he had a pain under the right shoulder, and later in March he began to find flecks of blood in his sputum. On his way to New York to get some money from the Steamship Company, he had a real hemorrhage, and then went to the Marine Hospital in New York City where it was found he had tuberculosis. From then on he received treatment from the Marine Hospital on Staten Island and later in New Mexico.

He is now suffering from tuberculosis, which has to some extent been arrested, but the consensus of all the doctors in the case was that he is not yet fit to resume his usual work and will not be for some time to come, although it was testified he could do some light work.

The first question which arises in the case is whether or not this court has jurisdiction. As has already been said, the libellant is not a resident of this district, and at the time of the filing of the libel, the ship was not found within the district, and, as a matter of fact, never could be.

Section 2 of the Suits in Admiralty Act, 41 Stat. 525, 46 U.S.C.A. § 742, in so far as material, reads:

"In cases where if such vessel were privately owned or operated, * * * a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States * * * provided that such vessel is employed as a merchant vessel * * *. Such suits shall be brought in the district court of the United States for the district in which the parties so suing, or any of them, reside or have their principal place of business in the United States, or in which the vessel or cargo charged with liability is found. * * *"

What really is the question, as I see it, is whether or not the last sentence quoted relates to jurisdiction over the subject matter or jurisdiction over the person. I think it is purely a "venue" provision, giving the right to a litigant to bring his suit in one of the three districts mentioned, namely, the one in which he resides, or the one in which any of the libellants reside, or the one in which the vessel charged with liability is found. Nahmch v. United States, 267 U.S. 122, 125, 126, 45 S.Ct. 277, 69 L.Ed. 536; Alsberg v. United States, D.C., 285 F. 573, 574; Galban Lobo & Co., S. A. v. United States, D.C., 285 F. 665. If I am correct in that determination, the respondent, by its general appearance and its litigation of the merits of the action, has waived any objection it might have to the jurisdiction of its person. Commercial Trust Co. v. United States Shipping Board, 2 Cir., 48 F.2d 113; Kunglig Jarnvagsstyrelsen v. United States, 2 Cir., 19 F.2d 761, 763.

It is argued that the statutory provision designating the district court in which the

vessel is found, where libellant is not a resident of this country, refers to jurisdiction over the subject matter, and, therefore, cannot be waived. It apparently was so held in Blamberg Bros. v. United States, 260 U.S. 452, 458, 43 S.Ct. 179, 67 L.Ed. 346, and perhaps in Carroll v. United States, 2 Cir., 133 F.2d 690, 692, which latter case dismissed the libel against the United States, relying upon the Blamberg case. It seems to me, however, that the substantive jurisdiction conferred by the Suits in Admiralty Act was the consent by the government to be sued in actions such as this arising out of the operation of a merchant vessel, where a similar action could be maintained against a private owner or ship. The sentence referred to merely designated the place where such an action must be brought. The force of the Blamberg decision, I think, has been materially modified by the Supreme Court in the Nahmeh case, and in the case of Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472. Judge Taft wrote the prevailing opinion in all three cases, and obviously liberalized the strict ruling first made in the Blamberg decision. In fact, in the Eastern Transportation Co. case, the libellant was not a resident of the district where the action was brought, nor was the ship found in that district. Like the ship here, it had sunk at sea and never could be found in the Virginia district where that action was maintained; and the opinion shows that the questions of venue were waived, which could not be done if there were no jurisdiction of the subject matter. The district court there had dismissed the libel and the Supreme Court reversed. Answering the question of whether or not the Blamberg and the Nahmeh cases, and Shewan & Sons v. United States, 266 U.S. 108, 45 S.Ct. 45, 69 L.Ed. 192, militated against its decision then about to be made, Mr. Chief Justice Taft wrote [272 U.S. 675, 47 S.Ct. 293]:

"The question in the Blamberg case (which involved a barge in the Port of Havana at the time the libel was filed) was whether the act applied at all in cases in which there could be no immunity granted by Congress to vessels of the United States. The Shewan case only involved the question whether that which had been a merchant vessel of the United States continued to be such and satisfied the act, if it were laid up and had not been changed to be a public vessel of the United States. The Nahmeh case was one of venue as to the District Courts in which suits could be brought under the act; that is, whether only one of three courts described in the act, or any one of the three, could be used in each instance."

In that case, it was clearly held that the loss of the vessel, or the loss of its use as a merchant vessel, did not defeat jurisdiction, and that a suit in personam arising from a tort caused by the negligence of the United States could be maintained in the district where it was brought, the question of venue being waived. See also W. R. Grace & Co. v. United States, D.C., 53 F.2d 272.

The next question is whether or not the respondent was guilty of negligence. I think it was, for failure properly to inspect the hull of the Thomas Hooker before she left Glasgow on her last trip, and also for failure properly to ballast her. What was done has been described in the previous statement of facts. It is obvious that there was never at any time an adequate inspection of the hull of this vessel to determine whether or not the concussion and vibration caused by the explosion of the bombs at Oran, the buffeting which it received on its trip light from Oran to Glasgow, and on its first attempt to make the Atlantic crossing just prior to the one in which it was lost. The testimony upon the subject was not in material dispute. Lieut. Commander Nesbitt, called by the respondent, testified that tests could be made to ascertain whatever damage might have been sustained by the bombing; that if any were suspected, there could be a test inside with a hammer and outside by a diver. He gave as his opinion as to the cause of the occurrence that the vessel had been out in a westerly storm before she put back for an additional amount of ballast and during this first storm she had encountered steering engine trouble, and it was due to that that she had put back for more ballast; when she left the second time, she encountered more severe weather than it had the first time, a storm of which the wind force was from 45 to 60 miles an hour; that the engineers on the vessel, from reports which he had seen, had to stand at continuous throttle watch, that is, they could not leave their throttle because every time the ship would dive and pitch, the engine would practically have to be stopped to keep the propeller from racing and shaking the vessel to pieces. Any damage that had been suffered previously or any bombing would be a contributory factor to the weakening of the

vessel. His opinion was that the bombings, other accidents that had occurred to the vessel, and heavy weather damages would be contributing factors, that the wave which struck the ship at the time of the explosion was a contributing factor with the exceptional weather and the gale. He also said that in his opinion, insufficiency of ballast on the first trip out was a contributing factor. Captain Hathaway, in his report of the casualty, gave as its cause insufficient ballast. Upon the witness stand he testified that was his opinion then, that since that time in the past years where so many more Liberty ships have broken up, he still thinks that ballast may have had something to do with it, but that he is willing to admit that he might very easily have been wrong. He further testified that his reason for making a report of insufficient ballast as the cause of the accident was because there was not enough ballast in the center of the ship and too much at the ends; that a ship was much like a girder and if there were too much weight on either end of it, it would be apt to buckle in the middle.

I think it a fair conclusion, and I so find, that the cause of this crack-up may fairly be attributed to the failure to inspect, and either the want of sufficient ballast which made the ship so light that it was tossed around in the sea, racked by the frequent emergence of the propellers out of the water, or by the improper location and distribution of the ballast.

The next question in the case is whether or not the exposure which the libellant underwent on March 5th after the crack had developed, caused him to become tubercular and resulted in the injury and loss of which he now complains, or whether it lighted up or aggravated a preexisting but dormant tubercular condition. Here again, I think the libellant should succeed. With one exception, and that is the testimony of the doctor who was called by the respondent and who had never seen the libellant prior to the accident, the testimony shows that McGhee was an able bodied, well man prior to his signing on this ship, had been able to do laborious work both on land and at sea, and had never had any evidence of a tubercular condition. His physical examinations, which seem customarily to have been made before any man is permitted to sign on as a seaman, apparently gave him a clean bill of health, at least insofar as any internal disease was concerned. He was able to and did do the work assigned to him while upon the vessel in question, and apparently without any complaint on the part of anybody. Obviously he was exposed to the severe cold, excitement, and water, snow and spray, over a long period of time after he had been startled by the explosion on the ship and before he was finally landed on the corvette. His medical testimony is that such exposure and the subsequent events following could properly be attributed to the occurrences on the evening of March 5th and those following. There is no doubt that he suffered from pulmonary tuberculosis and is still suffering from it. His disease was clearly recognized at the Marine Hospital at New York City on May 18, 1943, and from that place, he was transferred to the Marine Hospital at Stapleton, Staten Island, where he remained from May 19, 1943, for about a year. He was transferred from there as an ambulant patient to the Fort Stanton Marine Hospital in New Mexico, being admitted there on May 19, 1944, and leaving there at his own request on September 16, 1944. All of the doctors testified that he is not yet able to work at his original occupation but there is proof that he can do light work.

I find that his tubercular condition was produced as a result of the occurrence of March 5, 1943, when the ship cracked up and that he is still disabled.

I also find that he has been furnished with proper hospitalization and that he has received such care to effect such improvement in his condition as may reasonably be expected to result from nursing, care and medical treatment, and at least as far as ordinary and reasonable medical means extend.

Accordingly, I make an award to him in the sum of $20,000, which is intended to cover the injuries which he has received, and their consequences now and in the future, and also for the loss of his earnings as a result thereof.

Inasmuch as this award amply takes care of anything he might recover for maintenance and cure, I make no award on that cause of action and the same is dismissed.