**THE ANNA HOWARD SHAW.**

**WARREN v. UNITED STATES et al.**

District Court, S. D. New York.

Dec. 8, 1947.

Rehearing Denied March 4, 1948.

See 76 F.Supp. 735.

Saul Sperling, of New York City (Xavier N. Sardaro, of New York City, of counsel), for libellant.

John F. X. McGohey, U. S. Atty., of New York City (Kirlin, Campbell, Hickox & Keating, of New York City, of counsel), for respondent United States.

Kirlin, Campbell, Hickox & Keating, of New York City (Walter X. Connor, of New York City, of counsel), for respondent American South African Line, Inc.

MEDINA, District Judge.

Libellant, a merchant seaman, was injured while a member of the crew of the S. S. "Anna Howard Shaw," although not aboard the vessel at the time. In this proceeding in personam he claims maintenance and cure from the United States, the owner of the vessel, and the American South African Line, Inc., which was acting under the customary form of general agency agreement.

§ 2 of the Suits in Admiralty Act, 46 U.S.C.A. § 742, provides:

"In cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States or against any corporation mentioned in section 741 of this title, as the case may be, provided that such vessel is employed as a merchant vessel or is a tugboat operated by such corporation. Such suits shall be brought in the district court of the United States for the district in which the parties so suing, or any of them, reside or have their principal place of business in the United States, or in which the vessel or cargo charged with liability is found. * * *"

At the time of the filing of the libel, the vessel was not within the waters of the United States or any of its territories. At all times libellant was a resident of Lansing,

Michigan. It was stipulated that during the pendency of this proceeding the vessel was for a time within the territorial waters of the United States and within the Southern District of New York. The respondent United States pleaded both lack of jurisdiction and improper venue.

It may be that the language of the statute can be so construed as to require a holding that the Court was without jurisdiction. Blamberg Brothers v. United States, 1923, 260 U.S. 452, 43 S.Ct. 179, 67 L. Ed. 346; Carroll v. United States, 2 Cir., 1943, 133 F.2d 690; Abbott v. United States D.C.S.D.N.Y., 1945, 61 F.Supp. 989; Untersinger v. United States, D.C.S.D.N.Y., 74 F.Supp. 155, 1947 A.M.C. 1348; Barnes v. United States, D.C.S.D.N.Y., 1946, 67 F. Supp. 571; Sawyer v. United States, D.C. S.D.N.Y., 1946, 66 F.Supp. 271. On the other hand, the basic purposes of the Suits in Admiralty Act and the similarity of the language of § 2 to the pattern of other provisions of law pertaining to venue would seem to indicate a lack of intention on the part of the Congress to make the presence of the vessel in the waters of the United States at the time of the filing of the libel an indispensable prerequisite to jurisdiction. Nor does it seem possible to reconcile a holding of lack of jurisdiction with judicial determinations that the Court might proceed to decree where the vessel has been torpedoed or where, for other good and sufficient reasons, the presence of the vessel could not be had or the point had been waived. Eastern Transportation Co. v. United States, 1927, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472; Kunglig Jarnvagsstyrelsen v. United States, 2 Cir., 1927, 19 F.2d 761; McGhee v. United States, D.C.S.D.N.Y., 1945, 62 F. Supp. 224, reversed on other grounds, 2 Cir., 1946, 154 F.2d 101; Hong v. United States, D.C.S.D.N.Y., 1944, 59 F.Supp. 794. No stipulation or act of parties or adventitious circumstance arising out of war conditions could suffice to confer upon the Court a jurisdiction over subject matter which otherwise would not exist. But this is by the way.

It is at least clear that the objection to venue is well taken; and the libel against the United States must accordingly be dismissed. Abbott v. United States, D.C.

S.D.N.Y., 1945, 61 F.Supp. 989; Rodinciuc v. United States, D.C.E.D.Pa., 1947, 74 F. Supp. 284. Apparently libellant does not contend otherwise; and no application has been made to transfer the cause to any other district.

■ Respondent American South African Line, Inc., may still be liable, despite the dismissal of the libel as against the United States. Carroll v. United States, 2 Cir., 1943, 133 F.2d 690. But it asserts that it is not liable for maintenance and cure because the relationship of employer and employee did not exist between it and libellant.

American South African Line, Inc., was the general agent, having certain powers over and duties toward the S. S. "Anna Howard Shaw," appointed under a General Agent Service Agreement with the War Shipping Administration, similar to that cited and interpreted in Hust v. Moore-Mc-Cormack Lines, Inc., 1946, 328 U.S. 707, 66 S.Ct. 1218, 90 L.Ed. 1534. Under the terms of that agreement, the general agent procures members of the crew, and makes them available to the ship's master, and in this case American South African Line, Inc., was responsible for the hiring of libellant. The Hust case held that, for purposes of suit under the Jones Act, 46 U.S.C.A. § 688, the general agent was the employer of a seaman injured aboard ship. In spite of the assertion by the Department of Justice in a letter, a copy of which was submitted to the Court, that the general agent "is a mere ship's husband looking after the accounting and certain other shoreside operations of the vessel," no argument is any longer possible, after the Hust case, that the general agent is not, at least for some purposes, an "employer."

■ The question is whether the general agent is an employer for the purposes of liability for maintenance and cure. The reasoning of the Hust case would seem persuasive that it is. Respondent, however, attempts to distinguish that case because it was a suit for indemnity under the Jones Act, whereas this is not. True, respondent does not deny that a general agent may be liable both for indemnity under the Jones

Act and for maintenance and cure, Lewis v. United States Navigation Co., D.C.S.D. N.Y., 1944, 57 F.Supp. 652, but it asserts that a suit for maintenance and cure against a general agent cannot be maintained independently of a suit under the Jones Act.

I cannot make this distinction. If a general agent is an employer for the purposes of liability in tort under the Jones Act, it does not seem far-fetched to consider him an employer for the purposes of liability for maintenance and cure, that pervasive incident of the maritime contract, Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368, antedating the Jones Act by hundreds of years. The Osceola, 1903, 189 U.S. 158, 169-175, 23 S. Ct. 483, 47 L.Ed. 760. It would be incongruous to say that the Jones Act has by implication so weakened it as to make it incapable of independent suit. 1 Benedict, Admiralty 258 (6th Ed. 1940). There are authorities for this view, both in the Federal, Broadbent v. United States, D.C.E.D. Pa., 1947, 73 F.Supp. 612, 1947 A.M.C. 749, and State courts. Moss v. Alaska Packers Ass'n, 1945, 70 Cal.App.2d Supp. 857, 160 P. 2d 224; Martinez v. Marine Transport Line,[1] N.Y.City Municipal Court 1947.

Nor does Caldarola v. Eckert, 1947, 332 U.S. 155, 67 S.Ct. 1569, require a different conclusion. There a stevedore was injured while working aboard a vessel with respect to which an agent was functioning under the usual General Agent Service Agreement. The general agent had nothing to do with his being hired, as he was the employee of a stevedoring concern under an independent contract with the government. The Supreme Court held that this agreement did not impose upon the agent "duties of care to third persons, more particularly to a stevedore under employment of a concern unloading the vessel pursuant to a contract with the United States." 332 U.S. at page 159, 67 S.Ct. at page 1571. Libellant here is not a business invitee, a third person, but a seaman procured by the general agent under the Service Agreement. He is more like Hust than Caldarola. It would not impose an unusual burden upon general agents to require them to make payments

---

[1] No opinion for publication.

for maintenance and cure, for it has apparently been the practise for them to do so. See Legal Bulletin No. 53, War Shipping Administration, February 28, 1945. I find that American South African Line, Inc. is the libellant's employer for the purposes of a claim for maintenance and cure. Now to the merits.

Libellant was a messman aboard the S. S. "Anna Howard Shaw." On October 30, 1944, while the vessel was in the Bay of Naples, Italy, libellant left on shore leave. In company with the ship's carpenter and another messman, he went sightseeing. They came to the waterfront town of Bagnoli (referred to by libellant as Magnolia). The group stopped at various stores and at one such place they bought a small bottle of wine which they divided among them. About three miles down the shore from where they had landed from a motor lifeboat, they stopped at a dance hall and stayed an hour and a half or so. Libellant says he was dancing most of the time, and drank only one additional glass of wine.

After a time libellant entered another room and approached a large window overlooking the sea, and he says the sight of the waves breaking upon the rocks some thirty-five feet below intrigued him. The French doors of this window extended to the level of the floor and he observed a sort of wholly unprotected ledge or balcony, which extended out from the building some two and a half or three feet. There was no railing of any sort and the slightest misstep or unsteadiness was almost sure to precipitate libellant. In any event, it was a perilous undertaking to go out upon this balcony and one even more perilous to lean over the edge to get a better view of the rocks and waves immediately below. But this is what libellant did. When he came to a position where the toes of his shoes were six inches from the edge, he leaned over, at the same time taking hold of a rod about one-half inch in circumference, which was apparently affixed to the building to his right. He merely took a casual glance at this rod and makes no claim to have done more. It looked like a "lightning arrester or something of that type." Whether the fastenings such as they were had been weakened by bombs and shell fire, which had otherwise marked the buildings in the vicinity to some extent, does not appear. Nor does the testimony disclose the purpose which this rod served. As he grasped it, and leaned over the edge, the rod came off and libellant lost his balance and fell. A similar ledge or balcony on one of the windows below broke his fall or he would have sustained injuries far more serious than a broken leg. This fall and its consequences are the basis for his suit for maintenance and cure.

■■ A seaman, injured in the service of his ship, is entitled to maintenance at its expense. 1 Benedict, Admiralty § 83 (6th Ed. 1940). "Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive" him of maintenance, the "traditional instances" being "venereal disease and injuries received as a result of intoxication." Rutledge, J., in Aguilar v. Standard Oil Co., 1943, 318 U.S. 724, 731, 63 S. Ct. 930, 934, 87 L.Ed. 1107. "Gross" negligence also deprives him of maintenance. Reed v. Canfield, C.C.D.Mass., 1832, 20 Fed.Cas. 426, No. 11,641; Jackson v. Pittsburgh S. S. Co., 6 Cir., 1942, 131 F.2d 668. I shall first consider whether libellant was in the service of the ship when he was injured, then whether he was drunk, and whether he was "grossly" negligent.

When libellant was injured, he was over three miles from the ship, was not doing any work for the ship, but was where he was for his own pleasure. He claims he was "in the service of the ship," within the meaning the Aguilar case gave to that term.

■ That decision allowed maintenance and cure to seamen who were injured some distance, but no more than half a mile, from their ships, one while going on, and the other returning from, shore leave. In delivering the opinion of the Court, Justice Rutledge considered at length the policy bases for maintenance and cure and the necessity of extending its protection to sailors ashore. "Relaxation beyond the confines of the ship is necessary if the work is to go on, * * * shore leave is an elemental necessity in the sailing of ships * * * not merely a personal diversion. * * * it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange sur-

roundings. Accordingly it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment." 318 U.S. at page 734, 63 S.Ct. at page 935. The language of the opinion would justify a holding here that libellant was in the service of his ship. Indeed, it has been suggested that the rationale of the Aguilar case "would seem to cover all injuries incurred without misconduct while on shore leave." Note, The Supreme Court of the United States during the October Term, 1942: I, 43 Columbia Law Review 837, 864, n. 162 (1943).

The respondent, though, points out that all the Aguilar case decided was that seamen injured while on their way to or from shore leave are entitled to maintenance; that only in dictum did Justice Rutledge extend that liability beyond the facts before the court. It insists that it would be improper to subject the shipowner to liability for any and every injury his seamen received on shore leave, except those occasioned by their serious fault. Every drunken brawl in every waterfront dive would put the shipowner to expense as long as the injured seaman maintained he was an innocent bystander and the shipowner could not prove the contrary. The shipowner would in effect become an insurer of the safety of his men, on and off the ship, subject to his chance of establishing misconduct.

If the language of the Supreme Court is to be taken as anything more than sociological disquisition, courts must regard it as pointing the way to a freer allowance of maintenance, even in situations less appealing than those then before the Court. It would be futile for courts to undertake to say how necessary shore leave was under the circumstances of a particular case; and the reasoning of the Supreme Court must be disregarded if it is to be held that maintenance must be granted to a seaman about to go on leave, but withheld from one who is actually enjoying that recreation which is said to be the "ship's business," 318 U.S. at page 734, 63 S.Ct. at page 936, as well as his.

Courts have on the whole given the Aguilar case a liberal interpretation. In Muise v. Abbott, D.C.Mass., 1945, 60 F. Supp. 561, the libellant, returning from shore leave, fell into a pit an unspecified distance from his ship. Maintenance was allowed. In Nowery v. Smith, D.C.E.D.Pa., 1946, 69 F.Supp. 755, affirmed 3 Cir., 1947, 161 F.2d 732, 1947 A.M.C. 756, the libellant while in a barroom on leave was injured by another member of the crew. Allowing maintenance, the Court said, 69 F.Supp. at page 757, " * * * logic compels the conclusion that the seaman should also be considered on 'the shipowner's business' while he is actually enjoying his shore leave." In Moss v. Alaska Packers Ass'n, 1945, 70 Cal.App.2d Supp. 857, 160 P.2d 224, the plaintiff, on shore leave in Tasmania, was hit over the head in a barroom. Maintenance was allowed. In Stanley v. Weyerhaeuser S. S. Co., Super.Ct. San Francisco 1947, 1947 A.M.C. 411, the plaintiff had been injured seventeen miles from his ship while on leave. The Court set aside a release he had executed to the shipowner, because the latter's representative had not explained to him his rights under the Jones Act and the Aguilar case.

This liberal interpretation seems to prevail in the Second Circuit. In Kyriakos v. Goulandris, 2 Cir., 1945, 151 F.2d 132, a crew member assaulted the libellant on leave near the ship as a result of a shipboard disagreement. The Court held maintenance might be awarded, the Aguilar case being an alternative ground for its holding. In an earlier stage of that case, Kyriakos v. Polemis, D.C.S.D.N.Y., 1945, 63 F.Supp. 19, Judge Bondy allowed maintenance, citing the Aguilar case. In Dasher v. United States, D.C.S.D.N.Y., 1945, 59 F.Supp. 742, the libellant had been injured on shore leave in a Mediterranean port. Judge Goddard allowed maintenance. Judge Leibell cited the Aguilar case and Kyriakos v. Goulandris, in allowing maintenance in Sullivan v. United States, D.C.S.D.N.Y., 1947, 73 F.Supp. 525, 1947 A.M.C. 426, where the libellant had been set upon and robbed returning from shore leave.

A few cases, however, interpret the Aguilar case more strictly. In Siclana v. United States, D.C.S.D.N.Y., 1944, 56 F. Supp. 442, the libellant, returning from shore leave, had been attacked an unspeci-

fied distance from his ship. Judge Hulbert sustained exceptions to the libel, id. at 443: "* * * the locality of the attack is not identified. Its proximity to the place of employment (the ship) is not disclosed and it may have been so far remote that his employer may not have been under any duty of responsibility whatever." In Smith v. United States, D.C.E.D.Va., 1946, 74 F. Supp. 275, 1947 A.M.C. 481, the libellant on shore leave turned his ankle in the driveway of a friend's house over seven miles distant from the ship. The Court, limiting the Aguilar case to its facts, held maintenance could not be allowed to a libellant injured in familiar surroundings. The same rationale underlay Taylor v. United Fruit Co., N.Y.Sup.Ct.App.Term, 1947, 71 N.Y.S. 2d 22, 1947 A.M.C. 1297, where the plaintiff, at home on leave, stepped out to buy a newspaper and was injured on the way back. The Court reversed a judgment for maintenance.

If there is a place where the shipowner's liability for maintenance thins out and disappears, I do not think surveyors' instruments may be used to find it. The policy considerations protecting seamen in transit to and from shore leave do not automatically vanish throughout the course of the leave itself. Moreover, the reasoning which underlies the conclusions arrived at in the Aguilar case seems a safer guide than the exact circumstances of the particular case or chance phrases to be found in the text of the opinion. If the logical results of this reasoning are to be whittled down by fine distinctions, it seems that the lines of demarcation should be drawn by the Supreme Court and not at nisi prius. Delaware & Hudson Co. v. Commissioner of Internal Revenue, 2 Cir., 1933, 65 F.2d 292, 293; Farmers' Loan & Trust Co. v. United States, D.C.S.D.N.Y., 1925, 9 F.2d 688, 689; Cameron v. United States, 9 Cir., 1918, 250 F. 943, 947; Bakewell v. United States, 8 Cir., 1940, 110 F.2d 564; Tucker v. Norton, D.C.E.D.Pa., 1943, 49 F.Supp. 483, 484. In any event, by any test reasonably consistent with the opinion of Justice Rutledge the place where Warren fell was not too far from the ship and the surroundings were far from familiar. I hold the libellant was injured in the service of his ship.

The evidence as to libellant's intoxication is conflicting. He says he had had only about a third of a small bottle of wine and one glass more before he was injured. The record of the hospital to which he was taken after his injury, however, contains the entry "acute alcoholism." Libellant says he may have presented a stupefied appearance when he reached the hospital, because he had previously been given morphine; therefore the hospital doctors may have thought him drunk. The ship's log is interesting but inconclusive. It reads:

"On October 30, 1944, at Naples, Italy, Walter K. Warren, messman, on this date injured himself in fall; sent to 118th Station Hospital, Naples, Italy, for treatment. Fell off a cliff while on shore. He stated that he had a drink. Ralph R. Albert, carpenter, and James M. Barr, messman, stated Warren was sober. Injury apparently accidental."

I am inclined to think libellant was less sober than he says he was, but I find he was not so under the influence of liquor as to be barred from recovery.

Respondent asserts libellant's own "gross" negligence was the cause of his injury. Heretofore the question of "gross" negligence appears to have shaded somewhat into the question whether the injured seaman was in the service of the ship. Barlow v. Pan Atlantic S. S. Corp., 2 Cir., 1939, 101 F.2d 697, 698, 699; Jackson v. Pittsburgh S. S. Co., 6 Cir., 1942, 131 F.2d 668; The Ben Flint, D.C.Wis., 1867, 3 Fed.Cas.No.1,299, at page 185; The Quaker City, D.C.E.D.Pa., 1931, 1 F.Supp. 840, 841, 842. But since the Aguilar case tends to take the subtleties out of the question of injury in the ship's service, the question of "gross" negligence will probably bulk larger as an independent defense to maintenance actions from now on. While it may be, as contended by respondents, that conduct which would be adjudged "grossly" negligent away from the ship might be viewed differently when on the ship itself, it is likely that the difference is more apparent than real.

Attempts to classify the various gradations of negligence have largely proved elusive. Generalities are likely to lead to error in particular situations. If maintenance is to be denied here, the element of wilfulness or something akin to it must be found in one form or another. This being true it is hard to find any definition of "gross" negligence which will fit into the pattern of the maintenance cases other than that of a reckless disregard of safety. Restatement, Torts §§ 500, 502 (1934).

That libellant here was negligent seems sufficiently plain. Did he act in reckless disregard of safety? Perhaps it could be said that he did but for the one precaution of grasping the rod which he thought was securely fastened to the building. Accordingly, as he exercised some care, it can hardly be found that his act was "grossly" negligent in the sense of being reckless. Wilfulness in any real sense is contradicted by all the attendant circumstances as well as by libellant's testimony. The claim for maintenance is allowed in the amount of Six Hundred Forty-four and 16/100ths Dollars ($644.16) and a decree will be entered in favor of libellant for that sum together with costs against respondent American South African Line, Inc. As to respondent United States the libel is dismissed.

Submit findings.