## WARREN *v.* UNITED STATES.

No. 87.   Argued January 2, 1951.—Decided February 26, 1951.

*Saul Sperling* and *Charles A. Ellis* argued the cause and filed a brief for petitioner.

*Leavenworth Colby* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Acting Assistant Attorney General Clapp, James L. Morrisson* and *Samuel D. Slade.*

*Walter X. Connor* and *Vernon Sims Jones* filed a brief for the United States Lines Company, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner seeks in this suit maintenance and cure from the United States, as owner of S. S. *Anna Howard Shaw.* Petitioner was a messman who went ashore on leave while the vessel was at Naples in 1944. He and two other members of the crew first did some sightseeing. Then the three of them drank one bottle of wine and went to a dance hall, where they stayed an hour and a half, dancing. There was a room adjoining the dance hall that overlooked the ocean. French doors opened onto an unprotected ledge which extended out from the building a few feet. Petitioner stepped to within 6 inches of the edge and leaned over to take a look. As he did so, he took hold of an iron rod which seemed to be attached to the building. The rod came off and petitioner lost his balance and fell, breaking a leg.

The District Court awarded maintenance.[1] 75 F. Supp. 210, 76 F. Supp. 735. The Court of Appeals disallowed it. 179 F. 2d 919. The case is here on certiorari.

---

[1] Petitioner sued the United States as owner and American South African Line, Inc. as the general agent and operator. The District Court dismissed the libel as to the United States and held the general agent liable under *Hust* v. *Moore-McCormack Lines,* 328 U. S. 707. During the pendency of the appeal by the general agent and the

The Shipowners' Liability Convention, proclaimed by the President Sept. 29, 1939, 54 Stat. 1693, provides in Art. 2:

"1. The shipowner shall be liable in respect of—

"(a) sickness and injury occurring between the date specified in the articles of agreement for reporting for duty and the termination of the engagement;

"(b) death resulting from such sickness or injury.

"2. Provided that national laws or regulations may make exceptions in respect of:

"(a) injury incurred otherwise than in the service of the ship;

"(b) injury or sickness due to the wilful act, default or misbehaviour of the sick, injured or deceased person;

"(c) sickness or infirmity intentionally concealed when the engagement is entered into."

Petitioner's argument is twofold. He maintains first that under paragraph 1 a shipowner's duty to provide maintenance and cure is absolute and that the exceptions specified in paragraph 2 are not operative until a statute is enacted which puts them in force. He argues in the second place that, even if paragraph 2 is operative without an Act of Congress, his conduct was not due to a "wilful act, default or misbehaviour" within the meaning of that paragraph. An *amicus curiae* argues that the injury was not received "in the service of the ship" within the meaning of Paragraph 2 (a) of Art. 2.

---

cross-appeal by petitioner, *Fink* v. *Shepard S. S. Co.*, 337 U. S. 810, was decided. Accordingly the decree against the general agent was reversed and the Court of Appeals considered the case on the merits against the United States.

There is support for petitioner's first point in the concurring opinion of Chief Justice Stone in *Waterman Steamship Corp.* v. *Jones,* 318 U. S. 724, 738.[2] But we think the preferred view is opposed. Our conclusion is that the exceptions permitted by paragraph 2 are operative by virtue of the general maritime law and that no Act of Congress is necessary to give them force.

The language of paragraph 2, in its ordinary range of meaning, easily permits that construction. It is "national laws or regulations" which may make exceptions. The term law in our jurisprudence usually includes the rules of court decisions as well as legislative acts. That was held in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, to be true of the phrase "the laws of the several states" as used in the first Judiciary Act. 1 Stat. 73, § 34. No reason is apparent

---

[2] Chief Justice Stone relied on the report of the Secretary of State to the President on the need for legislation implementing the Convention. The Secretary said in part: "Many of the provisions of the convention are considered to be self-executing, and there would appear to be no need to repeat verbatim the language of the convention in a statute to make it effective. Some of the articles of the convention, however, after stating the general rule, provide that national laws may make specified exceptions thereto. If this Government is to be excepted from certain obligations of the convention or alterations in our present practice, it is necessary to do so affirmatively by statute." H. R. Rep. No. 1328, 76th Cong., 1st Sess. 6.

The Secretary had the following to say about Article 2: "Section 4 follows the exceptions in article 2 of the convention which sets forth the risks covered in the entire convention. . . . Paragraph 1 of article 2 of the convention was not incorporated in the bill because of the belief (1) that it is self-executing in that it establishes liability, although no definite amount is provided; and (2) that it will not be held by the courts to conflict with present law in this country." *Id.,* p. 6.

The implementing legislation was passed by the House, 84 Cong. Rec. 10540, but not by the Senate. See Hearings, Subcommittee of the Committee on Commerce, U. S. Senate, on H. R. 6881, 76th Cong., 3d Sess.; S. Doc. 113, 77th Cong., 1st Sess.; 87 Cong. Rec. 7434.

why a more restricted meaning should be given "national laws or regulations." The purpose of the Convention would not be served by the narrow meaning. This Convention was a product of the International Labor Organization.[3] Its purpose was to provide an international system of regulation of the shipowner's liability. That international system was aimed at providing a reasonable average which could be applied in any country.[4] We find no suggestion that it was designed to adopt a more strict standard of liability than that which our maritime law provides. The aim indeed was not to change materially American standards but to equalize operating costs by raising the standards of member nations to the American level.[5] If the Convention was designed to make absolute the liability of the shipping industry until and unless each member nation by legislative act reduced it, we can hardly believe some plain indication of the purpose would not have been made. Much of this body of maritime law had developed through the centuries in judicial decisions. To reject that body of law and start anew with a complete code would be a novel and drastic step. Under our construction the Convention provides a reasonable average for international application. The definition of the ex-

---

[3] See Fried, Relations Between the United Nations and the International Labor Organization, 41 Am. Pol. Sci. Rev. 963; Dillon, International Labor Conventions (1942); Shotwell, The Origins of the International Labor Organization (1934).

The United States became a member of the International Labor Organization on August 20, 1934. See U. S. Treaties, Treaty Series, No. 874.

[4] See International Labor Conference, Proceedings, Thirteenth Sess. (1929), 131.

[5] The report of the Secretary of State recommending ratification of the Convention emphasized that the treaty (1) would not materially change American legal standards and (2) would raise standards of member nations to the American level and thus equalize operating costs. S. Exec. Rep. 8, 75th Cong., 3d Sess. 3.

ceptions itself helps provide the average, leaving the creation of the exceptions to any source of law which the member nations recognize. That view serves the purpose of the Convention and conforms to the normal meaning of the words used. Our conclusion is that both paragraph 1 and paragraph 2 of Art. 2 state the standard of liability which legislative and decisional law define in particularity.

The District Court held that petitioner's degree of fault did not bar a recovery for maintenance and cure. The Court of Appeals thought otherwise. The question is whether the injury was "due to the wilful act, default or misbehaviour" of petitioner within the meaning of Art. 2, paragraph 2 (b) of the Convention. The standard prescribed is not negligence but wilful misbehavior. In the maritime law it has long been held that while fault of the seaman will forfeit the right to maintenance and cure, it must be "some positively vicious conduct—such as gross negligence or willful disobedience of orders." *The Chandos,* 6 Sawy. 544, 549–550; *The City of Carlisle,* 39 F. 807, 813; *The Ben Flint,* 1 Biss. 562, 566. And see *Reed* v. *Canfield,* 1 Sumn. 195, 206. In *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724, 731, we stated the rule as follows: "Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against it. Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection."

The exception which some cases have made for injuries resulting from intoxication (see *Aguilar* v. *Standard Oil Co., supra,* p. 731, notes 11 and 12) has no place in this case. As the District Judge ruled, the amount of wine consumed hardly permits a finding of intoxication. Petitioner was plainly negligent. Yet we would have to strain to find the element of wilfulness or its equivalent. He sought to use some care when he looked down from the

small balcony, as evidenced by his seizure of the iron bar for a handhold. His conduct did not measure up to a standard of due care under the circumstances. But we agree with the District Court that it was not wilful misbehavior within the meaning of the Convention.

Finally it is suggested that the injury did not occur "in the service of the ship," as that term is used in paragraph 2 (a) of Art. 2 of the Convention. We held in *Aguilar* v. *Standard Oil Co., supra,* that maintenance and cure extends to injuries occurring while the seaman is departing on or returning from shore leave though he has at the time no duty to perform for the ship. It is contended that the doctrine of that case should not be extended to injuries received during the diversions of the seaman after he has reached the shore. Mr. Justice Rutledge, speaking for the Court in the *Aguilar* case, stated the reasons for extending maintenance and cure to shore leave cases as follows (pp. 733–734):

> "To relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seaman hazards encountered only by reason of the voyage. The assumption is hardly sound that the normal uses and purposes of shore leave are 'exclusively personal' and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship, without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. . . . In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

"The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If, in those surroundings, the seaman, without disqualifying misconduct, contracts disease or incurs injury, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association. By adding this separation to the restrictions of living as well as working aboard, it forges dual and unique compulsions for seeking relief wherever it may be found. In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly, it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment."

This reasoning is as applicable to injuries received during the period of relaxation while on shore as it is to those received while reaching it. To restrict the liability along the lines suggested would be to whittle it down "by restrictive and artificial distinctions" as attempted in the *Aguilar* case. We repeat what we said there, "If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf." 318 U. S. at 735.

*Reversed.*

Mr. Justice Jackson and Mr. Justice Clark dissent on the ground that the injuries were not sustained in the service of the ship. *Aguilar* v. *Standard Oil Co.*, 318 U. S. 724, held a seaman to be in the ship's service while going to or from the ship over premises at which the ship docked, even if the purpose of being ashore was leave from duty. The route of access was not the choice of the seaman, and access to the ship was held essential to the ship's service.

But the choice of places of refreshment and varieties of entertainment are the sailor's own. Unless his employment is a policy of accident insurance while on leave, recovery cannot be sustained in this case. That might be a wise rule of law but we think it one that should depend on legislation.

MR. JUSTICE FRANKFURTER, dissenting.

We brought this case here because it involved construction of the Shipowners' Liability Convention, 54 Stat. 1693. As to that, I agree with the Court that the Convention does not afford any basis for libellant's claim. Assuming that Article 2 of the Convention is self-executing, a matter which I do not now have to decide, the exceptions permitted by paragraph 2 of that Article are operative by virtue of the general maritime law. But I am unable to agree that we should reverse the Court of Appeals on its application of the proper standard to the facts.

The District Judge gave this description of what happened:

"Libellant was a messman aboard the S. S. 'Anna Howard Shaw.' On October 30, 1944, while the vessel was in the Bay of Naples, Italy, libellant left on shore leave. In company with the ship's carpenter and another messman, he went sightseeing. They came to the waterfront town of Bagnoli (referred to by libellant as Magnolia). The group stopped at various stores and at one such place they bought a small bottle of wine which they divided among them. About three miles down the shore from where they had landed from a motor lifeboat, they stopped at a dance hall and stayed an hour and a half or so. Libellant says he was dancing most of

the time, and drank only one additional glass of wine.

"After a time libellant entered another room and approached a large window overlooking the sea, and he says the sight of the waves breaking upon the rocks some thirty-five feet below intrigued him. The French doors of this window extended to the level of the floor and he observed a sort of wholly unprotected ledge or balcony, which extended out from the building some two and a half or three feet. There was no railing of any sort and the slightest misstep or unsteadiness was almost sure to precipitate libellant. In any event, it was a perilous undertaking to go out upon this balcony and one even more perilous to lean over the edge to get a better view of the rocks and waves immediately below. But this is what libellant did. When he came to a position where the toes of his shoes were six inches from the edge, he leaned over, at the same time taking hold of a rod about one-half inch in circumference, which was apparently affixed to the building to his right. He merely took a casual glance at this rod and makes no claim to have done more. It looked like a 'lightning arrester or something of that type.' Whether the fastenings such as they were had been weakened by bombs and shell fire, which had otherwise marked the buildings in the vicinity to some extent, does not appear. Nor does the testimony disclose the purpose which this rod served. As he grasped it, and leaned over the edge, the rod came off and libellant lost his balance and fell. A similar ledge or balcony on one of the windows below broke his fall or he would have sustained injuries far more serious than a broken leg. This fall and its consequences are the basis for his suit for maintenance and cure." 75 F. Supp. 210, 213.

The District Judge concluded that libellant had not acted "in reckless disregard of safety." 75 F. Supp. at 216. The Court of Appeals for the Second Circuit unanimously reversed. It thought that

> "In the case at bar, the risk of serious injury or even death if the seaman should fall over the cliff, was obvious; and the requisite degree of care correspondingly higher. In the face of evident danger, the care which Warren took was very slight—a mere casual glance at the rod which he thought to be a 'lightning arrester or something of that type.' We think that a man who acts as he did under circumstances of danger does not show even a minimal degree of regard for the consequences of his act. Unless his ship is to be an insurer of his safety, he cannot recover against her." 179 F. 2d 919, 922.

I do not think the judgment of the Court of Appeals that the libellant's conduct was a "deliberate act of indiscretion," *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724, 731, should be disturbed.