
James J. **SELLERS**, Plaintiff,

v.

**DIXILYN CORPORATION**, Defendant.

Civ. A. No. 68–1481.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 16, 1969.

Wilson M. Montero, Jr., Kierr & Gainsburgh, New Orleans, La., for plaintiff.

W. K. Christovich, Christovich & Kearney, New Orleans, La., for defendant.

CASSIBRY, District Judge:

This is a suit for maintenance and cure, damages for failure to pay maintenance and cure, and attorney's fees, for injuries sustained by plaintiff in an automobile accident on November 9, 1967, on Highway 71 between Bunkie and Alexandria, Louisiana while plaintiff was en route from the drilling rig on which he worked in the Gulf of Mexico to his home in Colfax, Louisiana. The question for decision in the case is whether the plaintiff was "in the service of the ship" when he was injured.

At the time that the plaintiff James J. Sellers was injured he had been working as a roustabout for the defendant Dixilyn Corporation [Dixilyn] for about 11 months on its Rig No. 10, an offshore "jack-up" mobile drilling platform located 50 or 60 miles from Grand Isle, Louisiana. His duties were concerned with the drilling operation itself, although on one or two occasions he did assist in the "jacking-up" of the rig preparatory to its being moved from one location to another, but he was never aboard the rig when it was being moved. The operations at the rig were under a schedule which required Sellers to be on the rig for seven days and allowed him to be ashore for seven days. While on the rig he worked twelve hours and was off work for twelve hours. He ate and slept on the rig. Dixilyn had him transported from Grand Isle to the rig by boat, a trip of from five to seven hours, at the commencement of his working tour and back again at the end of it. He was paid by the hour for the time he worked on the rig, and was paid a stipulated amount for "boat time" for the boat trips to and from the rig. He received no pay for the seven days that he was off duty. Relief crews took

over the work on the rig during his time ashore.

A seven-day tour of duty ended for plaintiff on November 8, 1967. The relief crew arrived at the rig about 1:00 or 2:00 P.M. and the plaintiff was returned to the dock at Grand Isle at about 6:30 or 7:00 o'clock that evening. He and a co-worker, Huey Dubois, commenced the trip to Colfax in the latter's truck, stopping for gas and for food before Dubois, who was driving, struck a concrete abutment at about 2:30 o'clock on the morning of September 9, some 250 miles north of Grand Isle.

The plaintiff contends that he was a seaman on authorized shore-leave and generally answerable to the call to duty at the time of his injuries so as to be "in the service of his vessel" and entitled to maintenance and cure under Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) and Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949).

The defendant contends that the plaintiffs' periods ashore are not the authorized shore leave traditional in maritime employment, that because of the different method of operation of a drilling company from that of a ship the workers ashore can spend their off-duty time as they please, free of any responsibility to the drilling rig in the sense of being subject to call of duty so that plaintiff was not "in the service of the ship" when he was injured.

In Harden v. Gordon, 11 Fed.Cas. 480, Fed.Cas. No. 6,047 (1823), the law of the principal maritime nations, ancient in origin, was adopted into our maritime law to allow seamen disabled or taken sick in the service of the ship, without their own fault, the expenses of maintenance and cure. It was recognized that in contemplation of law the right to maintenance and cure is impliedly "a part of the contract for wages, and is a material ingredient in the compensation for the labour and services of the seamen." (see p. 481). The right commended itself to Justice Story (then on circuit) as founded on equity in the interest of humanity and consonant with sound policy in the national interest. He elaborated on the humanitarian interest as follows:

"* * * Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. Their common earnings in many instances are wholly inadequate to provide for the expenses of sickness; and if liable to be so applied, the great motives for good behaviour might be ordinarily taken away by pledging their future as well as past wages for the redemption of the debt. In many voyages, particularly those to the West Indies, the whole wages are often insufficient to meet the expenses occasioned by the perilous diseases of those insalubrious climates. On the other hand, if these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity. He will take the best methods, as well to prevent diseases, as to ensure a speedy recovery from them. He will never be tempted to abandon the sick to their forlorn fate; but his duty, combining with the interest of his owner, will lead him to succor their distress, and shed a cheering kindness over the anxious hours of suffering and despondency. * * * *"

Of the public policy serving the national interest, he said:

" * * * Beyond this, is the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation. Every act of legislation which secures their healths, increases their comforts, and administers to their infirmities, binds them more strongly to their country; and the parental law, which relieves them in sickness by fastening their interests to the ship, is as wise in policy, as it is just in obligation. Even the merchant himself derives an ultimate benefit from what may seeem at first to be an onerous charge. It encourages seamen to engage in perilous voyages with more promptitude, and at lower wages. It diminishes the temptation to plunderage upon the approach of sickness; and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw. * * * " (see p. 483).

The underlying policy of maintenance and cure compelled a liberal interpretation and broad application of the doctrine by the courts[1] and caused the Supreme Court of the United States in Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) to hold that a seaman injured on authorized shore leave was entitled to maintenance and cure. The Court recognized that "among the most pervasive incidents of the responsibility anciently imposed upon a shipowner for the health and security of sailors was liability for the maintenance and cure of seamen becoming ill or injured *during the period of their service*" and concluded that this obligation "should not be narrowed to exclude from its scope characteristic and essential elements" of a seaman's employment. (Emphasis mine.) Authorized shore leave was determined to be a characteristic and essential element of maritime employment so that injuries incurred by seamen while on such leave would be within their period of service by the following reasoning:

" * * * To relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seaman hazards encountered only by reason of the voyage. The assumption is hardly sound that the normal uses and purposes of shore leave are 'exclusively personal' and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. Even more for the seaman than for the landsman, therefore, 'the superfluous is the necessary * * * to make life livable' and to get work done. In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

"The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If in those surroundings the seaman, without disqualifying misconduct, contracts disease or incurs injury, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association. By adding this separation to the restrictions of living as well as working aboard, it forges dual

---

1. See Reed v. Canfield, 20 Fed.Cas. 426, Fed.Cas. 11,641 (1932) ; Ringgold v. Crocker, 20 Fed.Cas. 813, Fed.Cas. 11,843 (1848) ; The Bouker No. 2, 241 F. 831 (2d Cir. 1917) ; The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1902).

and unique compulsions for seeking relief wherever it may be found. In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment.

" * * * To exclude such injuries from the scope of the liability would ignore its origins and purposes." [2]

The traditional shore leave with which the Court was concerned in *Aguilar* differs greatly from the shore leave involved here. When the seven-day tour of duty on the rig is ended, the two working crews aboard the rig are in effect replaced in service by two other crews for an equal period. This is a regularly scheduled work arrangement which allows definite, equal periods ashore and on the rig. This work arrangement is beyond the traditional notion of shore leave, that is, the temporary, irregular going ashore for diversion and relief of the routine of the ship. Obviously, it is an accommodation of the fact that the offshore drilling worker lives ashore and allows for regular periods of living at home. It is not because of the vessel's business that the worker is ashore in the sense of *Aguilar*, but rather because Dixilyn operates under a work schedule which allows the workman to maintain the homelife of ordinary shore dwellers insofar as compatible with the demands of the offshore drilling business. To accomplish this necessarily requires that the worker be out of service during his time ashore because another has replaced him in the service of the vessel.

Since *Aguilar*, the Fifth Circuit Court of Appeals has recognized that time ashore made possible through arrangements not traditional to maritime employment are not regarded as within the seaman's period of service to the ship. Haskell v. Socony Mobil Oil Company, 237 F.2d 707 (1956). The time ashore in that case was 46 days' accumulated vacation time under a collective bargaining agreement. The seaman was denied maintenance and cure for injuries received in a motor vehicle accident ashore during that vacation time.

In spite of the fact that Seller's shore leave bears little resemblance to the shore leave traditional in maritime employment, he insists that he was in the service of the rig during his time ashore because he was generally answerable to its call to duty. The evidence does not sustain him. According to his own testimony he had never been requested to return to duty during his off-duty time, but he vaguely remembered that some persons he could not identify had been called back on other rigs. He considered that he was free to fish, farm or make extra money at a service station during his time ashore.

Huey Dubois, the driver of the truck at the time of the accident, and another worker Wayne Huckabay, who testified at the trial, had never been called back to work early. Dubois testified that, if he were called and was not doing something else and wanted to make the time, he would go back. Alton Dishangh, Drilling Superintendent for twelve years for Dixilyn, testified that to his knowledge no one had ever been called back to duty during their off-duty time. He might recall workers in case of emergency, but whether they returned to duty or not would be their decision. Their off-duty time was their own to spend as they pleased, even to the extent of obtaining other employment in that time if they wished, and he had some employees who did perform work for other companies during their off-duty time.

2. This reasoning was perpetuated and extended in Ferrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949) and Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951).

The evidence adduced in the case convinces the Court that Sellers was not generally answerable to the call of duty in the sense that he had an obligation because of his employment to return to the rig if called to duty during his time ashore. He was free to choose to return or not, if called.

■ Sellers contends additionally that to deny him maintenance and cure in this case is inconsistent with his status as a seaman, and will in effect create a semi-seaman unknown to the admiralty law. Sellers was a member of a crew of the vessel, and was therefore a seaman.[3] The real issue is not his status, but whether he was in the service of the vessel at the time of his injuries, and a finding that he was not in the service of the vessel does not affect his status as a seaman.

The Court has given this case long and careful consideration, with the view of avoiding doing anything reactionary to the steady broadening of the seamen's rights by the courts or anything contrary in spirit to the basic traditions of admiralty law. After much deliberation I am convinced that to exclude the injuries of Sellers incurred during his time ashore from the scope of liability for maintenance and cure does not ignore the origins and purposes of the liability. It strikes me that if the Court in *Aguilar* had had before it a petitioner whose contract of employment entitled him to spend one-half of his time ashore, the origins and purposes of the liability for maintenance and cure would not so readily have indicated that the shipowner should have been held liable as a full-time insurer of the seaman's health and safety.

The claim for maintenance and cure is DENIED and plaintiff's claim will be dismissed.

The Clerk shall prepare judgment accordingly.

---

3. Offshore Company v. Robison, 266 F.2d 769 (5th Cir. 1959); 46 U.S.C. § 713.