**Waldron C. WATSON, Libelant,**

v.

**JOSHUA HENDY CORPORATION,**
**Respondent.**
United States District Court
S. D. New York.
June 26, 1956.

Paul C. Matthews, New York City, for libelant, John J. Robinson, Edwin M. Bourke, New York City, of counsel.

Corydon B. Dunham, New York City, for respondent.

DAWSON, District Judge.

This is a seaman's action tried by the Court without a jury wherein libelant sues for recovery of damages for personal injuries and for maintenance and for his wages until the end of the voyage. The libel alleges that on or about April 18, 1955, while libelant was engaged in the course of his duties on board the S. S. Marine Arrow and while in his room, he was caused to be brutally assaulted by the master of the vessel, without provocation, and thereby sustained severe and painful personal injuries.

The issue in the case is primarily one of fact. It is whether the injuries suffered by libelant were the result of an unprovoked assault by the master, or whether they were the result of a fight, provoked by libelant, with the junior third mate and subsequent blows struck by the master in defending himself from a later assault of libelant. Subsidiary

to the determination of this issue is the question as to whether libelant was in a state of intoxication at the time of the assaults.

Certain of the facts appear without controversy. There is no dispute that libelant, who had been a seaman for some years in various capacities, was engaged as third mate on the S. S. Marine Arrow which started its voyage on the Pacific Coast on or about March 14, 1955 and sailed for the Mediterranean. Previous to this trip, libelant had served as mate on several vessels owned or operated by the respondent, including the S. S. Marine Arrow.

The voyage from the United States to Barcelona, Spain, went off uneventfully except that during the course of that voyage, the libelant was asked by the captain to take over the watch of the second mate, which was done. The vessel arrived at Barcelona on April 15, 1955. In port, libelant again returned to the watch customarily taken by the third mate, which was the watch from midnight to 8:00 a. m. Libelant stated that because of the noise of unloading the ship, he took a hotel room in town so that he could sleep during the day.

The principal characters in the dramatis personae in the ensuing events were:

*Libelant*, a man about 40 years of age, who at the time weighed about 210 pounds, and was about 5′ 9″ in height. He was the third mate on the ship.

*Sidney R. Sanford*, a man approximately 58 years of age, weighing about 150 pounds, and about 5′ 9″ in height. He was the junior third mate on the ship.

*William A. Neville*, a man about 35 years of age, who weighed approximately 160 pounds, and was 5′ 4½″ in height. He was the captain of the ship.

On April 17, 1955, libelant went ashore about 8:30 a. m., after having completed his watch and having had breakfast on the ship. He stated that he went to his hotel to sleep and got up about 4:00 p. m. The ship was scheduled to sail the following morning.

The events of the evening and early morning hours preceding the sailing of the ship furnish the background to this action, and might better be described by a Conrad or a Hemingway than in the dull prose of a Court opinion.

Apparently, the ship's officers and crew were intent upon taking advantage of the wine, women, and hospitality of the Spanish nation before they started the long voyage home. Libelant, with a slight tone of nostalgia, admitted on the stand that it was a memorable night in a seaman's life. He started early with a trip around Barcelona. About 8:00 p. m. he repaired to a restaurant with a shipmate where, he states, they had a steak sandwich, but no drinks. In fact, he claims that throughout the entire rest of the evening and early morning hours, he had only ten glasses of Malaga wine, although admitting that most of the other members of the crew were engaged in drinking brandy or more exhilarating liquid refreshments.

Libelant was scheduled to start his watch on the ship at midnight. He states that about 9:30 p. m., he decided to go back to the ship, but en route, stopped at a bar where a number of the crew had congregated and that he bought a round of drinks for them. He stated that while he was there, the captain came into the bar; that the captain was drinking brandy, and that he bought a drink for the captain, and the captain reciprocated for him. According to libelant's statement, the captain at this time told libelant that he would advise Sanford, the junior third mate, to stand libelant's watch, and that he need not go back to the ship. The captain testified, on the other hand, that he made no such statement to libelant, but that what in fact happened was that he saw that libelant was already under the influence of liquor, and that when he returned to the ship before midnight, he told Sanford, the junior third mate, not to let libelant take over the watch at midnight if he returned in an intoxicated condition.

Apparently, libelant, with some of the officers and members of the crew, re-

mained at the bar for some hours. At about midnight he, together with the second electrician, left the bar accompanied by two women, described by libelant as "senoritas". Libelant stated that the four of them went to a steakhouse where they had a "fine dinner", but he insisted that all that there was to drink at the dinner was one bottle of table wine between the four of them. After they finished the dinner, he and the second electrician and the two women left and went to a hotel, which was not the hotel at which libelant had been staying, and at this establishment, he and one senorita went to one room, while the second electrician and the other senorita apparently repaired to another room. A polite pall of privacy was drawn over the events of the next few hours in these hotel rooms, except that libelant made the inference clear that he and his senorita were not engaged in consuming alcoholic beverages during this period of time.

At about 3:00 a. m., libelant left the senorita and this hotel and went back to his own hotel, picked up his belongings, and started to return to the ship. Apparently, a number of other members of the crew had also returned for the same purpose, and he stated that there was a series of four or five taxicabs conveying the members of the crew back to the ship. His testimony was that he returned in a taxicab with one of the firemen and a second cook.

When libelant got on the ship at 4:00 o'clock, he stopped by the office where Sanford, the junior third mate, was still standing watch, having been at that time on watch since 4:00 o'clock the previous afternoon. What happened is described by Sanford in his testimony and summarized in the log as follows:

"0400 w/Watson 3rd Officer came aboard in an intoxicated condition and wanted to take over his watch 0000–0800 but I had been previously advised by Master not to be relieved by any officer while in this intoxicated condition. Mr. Watson became very angry and when I stood up he attacked me with his fists—and went beserk and commenced throwing glass ash trays one of which wounded my skin—a glass inkwell struck me in temple—he picked up a heavy chair but I managed to hold him off on that. Was knocked down a couple of times. He went to his room. I continued with the watch.

"S/S"

It appears clear from libelant's testimony that he was the aggressor in the altercation with Sanford. Sanford, as has been stated, was an elderly man of 58 who had been standing his own watch, as well as libelant's succeeding watch, while the rest of the crew were disporting themselves in Barcelona. Sanford testified that when libelant appeared, he seemed rather flushed and Sanford suggested that if libelant was not feeling well, he should turn in. Thereupon, libelant left the room but returned in a few minutes and called Sanford "a no good son of a bitch * * * several times". He challenged Sanford to stand up, which the latter did, and then he "charged me like a bull and knocked me down". Sanford struck libelant with his right fist, whereupon libelant stopped and left the office. In a few moments, libelant returned and again challenged Sanford to stand up. Thereupon, Sanford said to libelant: "you fathead, why don't you go to bed", at which libelant became angry, grabbed some ashtrays, and threw them at Sanford, striking Sanford in the body and in the knee. Apparently, the fight was pursued with vigor, with libelant using a chair and Sanford taking refuge behind a table. After this second fight, libelant returned to his own room.

Captain Neville returned to the boat around 7:00 in the morning and in the office of the ship he saw and read the entry which had been made by Sanford in the log. He asked Sanford for a report on the incident. Sanford told him that libelant had come back to the ship in an intoxicated condition, and that when Sanford would not let him relieve him, libelant had attacked him and administered a beating to him.

After having heard this story from his junior officer, Captain Neville went to libelant's room and knocked on the door. According to libelant, the captain pushed open the door. According to the captain, he walked in and asked libelant what the story was on the altercation with Sanford. Libelant states that he was sitting naked on his bunk when the captain came in, and that the captain said "What do you mean by working Sid over?" and when libelant started to explain, the captain started pommelling him about the eyes and head. According to the captain, when he asked what had happened with reference to Sanford, libelant told him to mind his own business and cursed him out and threatened to assault him. The captain told him he wanted to get the facts, and that if he had to call the police, he would. At that point, according to the captain, libelant came lunging out of his bunk, swinging at him and striking at him. "He was swinging at me there and I held my arm back to stop the blow and struck back. He kept lunging at me and I kept telling him to halt. He kept coming at me swinging and lunging. I don't recall just how many blows were struck there. I don't believe it was more than about six or seven, when he fell to the deck. I run from the room."

At this point, the radio operator came running up and asked what was the matter, and the captain told him that libelant had just attacked him. The captain testified that libelant's speech was thick, his face was flushed, and that his actions were those of a man either insane or intoxicated.

It is on these events of this altercation between the captain and libelant that this action depends. Libelant has made no claim for any injuries growing out of the altercation with Sanford and, in fact, it is hard to see how he could do so, since he admittedly was the aggressor, nor is it easy to determine which of the injuries which he asserts he suffered were the result of this altercation rather than the altercation with the captain.

Libelant claims that at the time the captain came into his room, he was sleepy but not intoxicated, and that the captain proceeded to beat him up and that he suffered the injuries for which he now seeks compensation. The captain states that libelant started to attack him, and that he did punch him back in order to escape from the room, and that libelant fell to the floor, and that the captain ran from the room.

Which of these two stories is the credible story? There is every reason to believe that libelant was in an intoxicated condition when he returned to the ship. There was no reason for Sanford to report otherwise or to refuse to give up the watch, if this had not been the case. The actions of libelant and the altercation with Sanford were not those of a responsible sober man. The background of the evening's activities and Sanford's testimony, combined with libelant's testimony on the stand, convince me that libelant was in an intoxicated condition when he returned to the ship.

The captain's testimony is much more credible when he states that libelant, still in an intoxicated condition, lunged at him and assaulted him when he asked for an explanation of the altercation with Sanford. Libelant states that the captain entered the room and started hitting him and kicking him until, according to his story, he was knocked into unconsciousness. Libelant admitted, however, that during this period of time, the captain was wearing glasses. He testified that he did not once hit back at the captain or endeavor to protect himself, even though the captain was a much smaller man than he and weighed considerably less. Libelant described the captain in his testimony as a little fellow whom he could easily have lifted up and "hung on a hook". However, he testified that he stood calmly by and allowed the captain to beat him into unconsciousness while not in any way protecting himself or hitting back at the captain. The story is unbelievable.

The testimony of libelant convinced me that he is unworthy of belief. He

contended that he was not a drinking man but also admitted that at one time he had been a member of Alcoholics Anonymous. There was testimony that on another occasion, when he worked for the same company in 1954 as a night mate, he had been inebriated. Libelant testified that he had not taking any intoxicating liquor of any kind since the incident in question, but the report of the United States Marine Hospital dated as late as April 28, 1956 stated that when the patient came in for an examination, he was slightly inebriated. As between the testimony of libelant and the testimony of the captain as to what happened on that night, I accept the version of the captain.

There is, of course, the question as to whether the captain used unnecessary force in repelling the assault of libelant. The captain testified that he had a bad back as a result of an accident in rough seas in the years preceding this incident, and that approximately a year and a half before that time, he had been under treatment at the San Francisco Marine Hospital which had furnished to him a back brace, and had recommended a spinal fusion. He was not wearing his brace at the time of the incident in question, but he states that when libelant lunged at him, his back was against the door. He testified: "I didn't want that man to attack me from the rear if I turned my back, the way he was attacking and lunging at me. It was just self-preservation. I couldn't turn my back to him and I didn't turn my back to him. * * * This man being over 200 pounds could do very serious damage to my back if he ever got on top of me * * * My back was right against the door. Mr. Watson fell to the deck and I swung around, opened the door, and run out." The evidence was sufficient to show that the captain did knock libelant down, but that he did so to protect himself and escape from the room.

The captain testified that as he left the room, the radio officer, who was also the first aid man, came running downstairs from above. The captain told him that libelant had just attacked him and to go in and take a look and see if libelant needed any medical care. The captain testified that the radio officer came into his office a few minutes later and told him that libelant "cursed him out and said he didn't want any of his damned help and at that time Mr. Watson was dressing and getting ready to go ashore." There was no indication that libelant had not been offered necessary first aid care and attention.

Apparently, libelant went ashore and after first talking to the customs officers and harbor police, went to the American Consul where he complained that he had been beaten by the captain. The consul sent for the captain and the agent of the ship, and they went to the consulate where statements were taken as to the affair. Libelant was told that he could return to the ship and would be taken back to the United States, but he refused to do so. Instead, he went to a hospital in Barcelona where he stayed approximately fifteen days. He was diagnosed as having a broken nose and a concussion, with injury to his eye. After being discharged from the hospital in Barcelona, he reported to the American Consul who arranged to have him transported back to the United States at the expense of respondent. He arrived in New York on May 23, 1955. They paid him the balance of overtime due him and gave him $200 as maintenance and offered to arrange for his transportation to his home on the West Coast. He did not return to the West Coast. Instead, on the following day, he went to the United States Marine Hospital for an examination. He entered the hospital as a patient on May 28 and remained there until July 15, 1955. The hospital records indicated that he was diagnosed as suffering from a post concussion syndrone, a post traumatic personality disorder and a fractured nasal bone. No permanent eye injuries were found, and the physical findings, including an electroencephalogram, indicated no permanent injuries. His condition was diagnosed by the United States Marine Hospital as "chronic para-

noid schizophrenia". On July 8, it was felt that the libelant had reached the maximum hospital benefits, but that he was not fit for duty for one year and was to return for further follow-up evaluation of his psychiatric disorders. From time to time since that date, he returned to the hospital for psychiatric consultations. He has done no work since the date of the incident. The hospital records also revealed that libelant had been hospitalized previously on February 1, 1949 for a period of three weeks, complaining of pains in his arms and legs, ringing in the ears, and attacks of dizziness, which are similar to the symptoms of which he now complains. At that time, this was diagnosed as an anxiety state and hypertension.

The Court finds as a fact that the injuries received by libelant were induced by his own willful misconduct in assaulting the junior third mate and the captain of the ship; that there is no evidence worthy of belief that the captain of the ship assaulted libelant or used unnecessary force in repelling the assault made by libelant upon him. There is no evidence that either the captain of the ship or the junior third mate had any vicious propensities.

### The Law.

It is well established that where a seaman suffers injuries as a result of his own willful misconduct, the respondent is not liable in damages, nor can the seaman recover for maintenance and cure. Kable v. United States, 2 Cir., 1948, 169 F.2d 90, 1948 A.M.C. 1595; Kable v. United States, 2 Cir., 1949, 175 F.2d 16, 1949 A.M.C. 1378.

The evidence does not show that the injuries were received by libelant as a result of an assault by a superior officer carried out in the discharge of his official duties and in furtherance of the employer's business, such as was the case in Civil v. Waterman Steamship Corporation, 2 Cir., 1954, 217 F.2d 94. Here the evidence leads inevitably to the conclusion that the captain of the ship did not precipitate an assault upon libelant but that he defended himself from an assault by libelant who had previously, while in an intoxicated condition, beaten up an elderly but junior officer. The evidence showed that any injuries received by libelant were the result of his own willful act, and that such willful act forfeits his right to maintenance and cure. See Warren v. United States, 1951, 340 U.S. 523, 528, 71 S.Ct. 432, 95 L.Ed. 503; The Shipowners Liability Convention, Art. 2, § 2(b), 54 Stat. 1693; Comment, "Maintenance and Cure", 50 Mich.L.Rev. 435 (1952).

The days of Captain Bligh are now happily over in our Merchant Marine, and there should be no occasion or justification for a captain of a ship administering a physical beating to any officer or seaman. But, at the same time, there is no reason for concluding that a captain, when attacked, is forced to follow a course of passive non-resistance and endure a beating by an inebriated subordinate.

### Conclusion.

The Court concludes that libelant has failed to establish a cause of action and is entitled neither to damages nor to an award for maintenance and cure.

Let judgment be entered accordingly.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

So ordered.