**Charles JONES, Libelant,**

**v.**

**UNITED STATES of America, Respondent.**

**No. 8318.**

United States District Court
E. D. Virginia,
Norfolk Division.

March 17, 1964.

Amato, Babalas, Breit, Cohen, Rutter & Friedman, Norfolk, Va., for libelant.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for respondent.

WALTER E. HOFFMAN, Chief Judge.

Libelant joined the nuclear ship SAVANNAH in the capacity of public room porter on August 18, 1962, while the vessel was at Yorktown, Virginia. He was assigned to quarters with one Leon Swan who was likewise engaged as a public porter. Libelant was, at the time stated, a heavy-set man weighing 220 pounds and standing five feet ten and one-half inches. Swan was only five feet seven and one-half inches tall and weighed about 130 pounds. The basis of this action is an altercation between libelant and Swan which took place during the early morning hours of August 23, 1962, in the mess hall of the vessel while docked at Savannah, Georgia. The claim is that Swan attacked libelant with a switchblade knife; that respondent failed to take proper safety precautions and knew that Swan had such a dangerous weapon aboard; as a result of which the respondent was negligent and the vessel was unseaworthy.

We start with the premise that, under any view of the testimony, libelant did not sustain his serious hip injury as a result of any cut by a knife. He contends that he remonstrated with Swan when he overheard Swan "cussing him out" and thereupon Swan turned around with a knife in his hand. During the ensuing tussle libelant fell over a chair or table, dislocated his left hip, underwent surgery, thereafter fell out of bed, and another operation was performed.

The version of what happened on the night of August 22 and the early morning hours of August 23 is in sharp conflict. About the only factor which is the subject of agreement is that both libelant and Swan exercised that age-old privilege accorded seamen and proceeded to imbibe beer, whiskey, and the combination of the two. While the overwhelming weight of the evidence points to the libelant as the aggressor, and hence guilty of wilful misconduct—all of which would dispose of the case—a review of the evidence will conclusively establish the reasoning of this statement.

Swan was already a member of the crew when libelant came aboard. His fellow crew members apparently thought well of him as they elected him as their union delegate from the steward's department. During his entire career as a seaman covering approximately 20 years, Swan has never been subjected to disciplinary action by the United States Coast Guard. He has never been convicted of a felony or assault and battery. So far as the evidence discloses he has not engaged in a fight since his boyhood days.

Libelant presents a different picture. Now 42 years of age, he was twice convicted of felonies involving moral turpitude when a young boy age 17 and 19. Aside from these facts which touch upon the credibility of his testimony, libelant's conflicting accounts as to what happened on the night in question, as disclosed by the history related by libelant to the admitting physician at the United States Public Health Service Hospital at Savannah, Georgia, and as revealed by prior contradictory statements made in discovery depositions, point significantly to the untrustworthiness of his testimony.

On the night of August 22 libelant borrowed $20.00 on Swan's assurance to another crew member that it would be repaid. Libelant and Swan then left the ship. While walking to the highway for the purpose of catching a bus to go into the city, an automobile stopped and the driver volunteered transportation. Swan's account of what then happened is that the driver, Reed, took the men to his mother's home and, after a short visit, the three men first went to a club where Swan bought some whiskey; they then visited a bar but Swan remained outside while Reed and libelant went into the bar; thereafter libelant returned to the automobile and requested a loan from Swan which was refused; libelant then made an effort to borrow from Reed who declined; libelant proceeded to get

belligerent, loud and boisterous; the three men got into the car and commenced the return trip to the ship, during the course of which libelant endeavored to get Reed to stop the car and get out and fight; as the automobile approached the Savannah docks, libelant reached over and hit Reed in the mouth, breaking his lip; Reed then bit libelant's arm; both Reed and libelant got out of the car and started tussling, with Swan endeavoring to break up the fight; the security police drove by in a car; libelant left and walked to the ship where he boarded same and went to his quarters; a few minutes later Swan came to the room and, after libelant threatened him, Swan went to the mess hall; while Swan was explaining to other crew members what happened ashore, libelant entered the mess hall and Swan, looking around at the time, fell from his chair and the first fight started which was broken up by two fellow crew members, Saunders and a man described as Larry or Lowery; libelant left the mess hall and, a few minutes later, returned to start another fight that resulted in the injury. Swan denies any possession of a knife of any kind, but did admit having a fishing knife in his quarters.

While the court is of the opinion that Swan omitted a few "bars" visited by the three men during the night of August 22, and that all three men had probably consumed an excessive quantity of beer and whiskey, his accounts of the two fights in the mess hall are substantially corroborated by other witnesses. Libelant's account of the events of the evening are at variance with Swan; he stated that the then unknown driver of the automobile had about one-half of a pint of whiskey which was quickly consumed; they then drove around to four or five clubs and in each they had a bottle of beer; on cross-examination he stated that he only had beer at the first three bars visited but when confronted with his discovery deposition wherein he testified he had three or four whiskies with beer chasers, he then said that they visited six or seven bars and, after first drinking beer, libelant thereafter indulged in whiskey with beer chasers—all of which was most conducive to a sober evening; libelant further related that at the last bar Swan ordered an expensive drink, whereupon libelant remonstrated and the two men had a few words; libelant insists that he then left the bar and, after five or ten minutes, Swan and Reed joined him with Swan commenting, "You don't generally run out on me;" as the automobile was approaching the ship, Swan started cursing and libelant said he wanted to get out of the car; the driver refused and libelant endeavored to reach over to cut off the ignition whereupon Reed "bit a hunk of meat out of my left arm;" the car stopped, Swan pushed libelant out of the car, the driver said something about a gun, and libelant left to go aboard the vessel; libelant said nothing about Swan coming to the room; in fact, libelant insists that Swan boarded the ship before he did; libelant recalls going past the mess hall en route to visit the ship's doctor for treatment of his arm, but confronted with his prior discovery deposition wherein he said that he *stopped* in the mess hall before going to the doctor, he said that he could not recollect this event—thus making it impossible to remember the first of two fights in the mess hall; libelant claims that he and Saunders went to the doctor's office and, since the doctor was not in, the men went to the mess hall for coffee; there he heard Swan "cussing and abusing" him and libelant remonstrated; Swan turned around with an *unopened* knife in his hand; libelant shouted to Saunders to get the knife and, when Saunders failed to act promptly, libelant told him to "wring the knife out of his hand" and Saunders did so; in the course of the tussle libelant fell and injured himself.

At the commencement of the trial proctor for libelant requested leave to take the deposition of Saunders at a later date, assigning as a reason that Saunders had told the libelant that he would be at the trial. No subpoena was issued for this witness. No attempt was made to

take his deposition. The case was heard on November 14, 1963, and on October 29, 1963, a final pre-trial order was entered, at which time proctor for libelant listed "Earl Saunders, Norfolk, Virginia," as a factual witness who would or might be present at the trial. No suggestion was made to the Court that Saunders was either available or unavailable. Reliance upon the presence of any seaman at a trial is, at best, a risk. Abundantly clear, however, is the fact that Saunders would not have been favorable to libelant as a statement from Saunders, dated August 23, 1962, manifestly indicates. While this statement cannot be considered as evidence, it certainly suggests why the court was correct in declining to permit post-trial depositions. Incidentally, proctors had agreed, and a court order so specified, that all *de bene esse* depositions would be taken on or before October 1, 1963.

Libelant's personal history statement given at the Savannah Hospital presents an interesting contrast to any other version of what happened. It states:

"Pt. is 41 yr. old, C/M, A/S, who was according to pt., deliberatly (sic) injured by other crewmen aboard the N.S. Savannah this night near midnight. Pt. had been doing some drinking, but does not appear to be significantly intoxicated now. States there has been union trouble & he does not belong to the union, so about 15 men ganged up on him. They hit him, pushed him around, pushed him down with his left hip striking a chair, and then stomped on him. Someone bit his left arm in the fight also."

This is a rather amazing account of the events of the evening when we consider that libelant is a member of the National Maritime Union.

As difficult as it may be to reconstruct the facts as related by two drunks, the Court is of the opinion, and so finds, that the situation as related by Swan is substantially correct, other than his account of the number of "bars" visited and the extent of alcoholic consumption by the three men. Probably the most convincing testimony comes from Cornelius Gordon, a messman later promoted to third steward. When this witness entered the mess hall, he saw Saunders and Lowery separating the libelant and Swan; Saunders told libelant to go to bed; libelant left; the men were then seated in the mess hall with Swan attempting to tell the others what happened when about ten minutes later someone said, "Look out"; libelant ran at Swan and attacked him and both men fell to the deck; Gordon saw no weapon of any description and he does not indicate that Swan was in an intoxicated condition.

One Goolsby, a member of the Chapman County Police Department, was stationed at the after gangway of the ship on the night in question. He talked to the libelant when he was about to go aboard and noted that libelant was staggering, his speech was slurred, and he had a strong odor of alcohol on his breath. After finally ascertaining his identity, libelant went aboard. Three to five minutes later Swan came along. Goolsby could detect a faint odor of alcohol but the speech and sense of balance seemed normal. About fifteen minutes later Goolsby was called by a crew member to come aboard. He found libelant lying on the floor in the passageway outside the mess hall. Swan was standing there at the time. Goolsby saw no weapons or knife.

■ While there are other depositions tending to inferentially substantiate respondent's theory of the case, there is no need to go further. At the outset the Court finds that no knife or other weapon played any part in any accident, nor was any knife or weapon nearby at the time. It was merely a brawl on the part of two sailors, one of whom was more intoxicated than the other. Not alleged in the libel but asserted as a triable issue in the final pre-trial conference order is the contention that the respondent owed libelant the duty to protect him if he was intoxicated. The short answer to his argument is that libelant was in his quarters where he was perfectly safe; his

roommate left these quarters to sleep in the mess hall; not satisfied, libelant followed and started the first fight; told to leave and go to bed, libelant returned and started the second fight which resulted in his injuries. While we all regret the seriousness of his injuries, it can only be said that it is better to be inflicted upon the assailant than the intended victim of the assault. As to the duty to protect, while the libel makes no allegation along these lines, there is nothing more that the respondent, its officers and crew members, could have done with the libelant other than to throw him in the brig. Intoxicated though he was, he had not reached that stage—nor are the brigs sufficiently large to hold sailors "out for the evening" and returning to the ship under the influence of liquor. Obviously libelant could still walk, run and fight. Respondent is not chargeable with the thoughts that pass through a seaman's mind in such a condition. There being no credible evidence pointing to negligence or unseaworthiness, these causes of action must be dismissed.

■■ The right to recover maintenance and cure is not dependent upon negligence or unseaworthiness. However, in this case, libelant was guilty of wilful misconduct and was the aggressor. It is one of the rare exceptions which excuses the respondent from the obligation to provide maintenance and cure. As was said in Watson v. Joshua Hendy Corporation, 2 Cir., 245 F.2d 463:

> "If the libellant-appellant were the aggressor in the fracas he had with Captain Neville, and then if Captain Neville used no more force than was necessary to repel the assault upon him, Watson can recover from the defendant neither damages for his injuries, nor his maintenance and cure, for his injuries were caused by his own misconduct."

The classic opinion of Judge Dawson, the trial judge, affords interesting reading of background material for the case cited above. Watson v. Joshua Hendy Corporation, S.D.N.Y., 142 F.Supp. 335.

The libel will be dismissed with costs assessed against the libelant. Expenses in connection with the taking of certain depositions in Texas have been the subject of a separate communication addressed to proctors and will be followed herein.