**UNITED STATES of America,**

v.

**Julio MORALES, Defendant.**

**Cr. No. 256.**

United States District Court
D. Montana,
Billings Division.

Aug. 26, 1964.

---

7.

Moody Brickett, U. S. Atty., Butte, Mont., and Richmond F. Allan, Asst. U. S. Atty., Billings, Mont., for plaintiff.

Sandall, Moses & Cavan, and James J. Sinclair, Billings, Mont., for defendant.

JAMESON, District Judge.

The defendant, a 16 year old high school freshman, two other juveniles, and an 18 year old boy are alleged to have forcibly broken into "a building known as the Ballantine Mercantile and Post Office used as a Post Office of the United States, with the intent to commit larceny in the part of the building used as a post office".

One of the group, James Samson, admitted a charge of juvenile delinquency arising out of the alleged act. He had given statements to officials of Yellowstone County, Montana, admitting participation in the breakin and involving the other three boys, including the defendant. He gave the same information to the Assistant United States Attorney. On the witness stand in this case, however, he repudiated his story in its entirety and denied any participation in the alleged offense by any of the four boys.

The parties agree that none of the statements given by Samson may be considered in determining whether plaintiff has shown by a preponderance of the evidence that the defendant, Julio Morales, committed the alleged offense of juvenile delinquency.

Morales was tried with Duane Reinke. At the close of the government's case, it was necessary to grant a motion of acquittal with respect to Reinke, as there was no competent evidence to sustain the charge against him. While Reinke had given a statement to the county officials, he consistently denied any participation in the alleged breakin. The fourth youth, an 18 year old named Rivera, was indicted by the grand jury, but did not at any time admit participation in the alleged offense.[1]

The only basis by which the court might find that the charge of juvenile delinquency is sustained as to this defendant, is his own statement taken on January 25, 1964. The memorandum filed by the plaintiff in support of the admission of defendant's statement sets forth the facts surrounding the arrest and interrogation as follows:

"His arrest was on a local charge— suspicion of the burglary of the Ballantine Mercantile and Post Office, Ballantine, Montana, which had occurred on December 8, 1963. He was brought to Billings, Montana, by the arresting officer and booked at the Yellowstone County Jail at approximately 5:30 P.M., January 24, 1964. He was held overnight. The following day, Saturday, January 25, 1964, upon interrogation by the arresting officer and a county juvenile probation officer he executed a written statement at approximately 11:-30 A.M. admitting that he had participated in the burglary. Thereafter he was held in county custody until Thursday, January 30, 1964, when a Complaint was filed against him by federal authorities and a warrant of arrest issued thereon. Upon his arrest under the federal warrant he was promptly presented before a United States Commissioner. Apparently he was not afforded an appearance before a magistrate while he was in county custody under the local charge although a 'commitment' was executed in his case by a judge of the local district court on Monday or Tuesday, January 27 or 28, 1964. According to the testimony given by a county juvenile probation officer this is the procedure regularly followed by local authorities in handling juvenile offenders."

The defendant had first been interrogated by two other county officers in the schoolhouse at Worden on December 9, 1963, when he denied any participation in the offense and was not placed under arrest. He was also interrogated on the afternoon of January 24 before being brought to Billings and again denied any participation.

On January 25 the defendant was interrogated by James A. Meeks, Deputy

---

1. The indictment was dismissed subsequent to the order of acquittal in this case.

Sheriff of Yellowstone County, and Clyde Montee, Deputy Probation Officer. Most of the questions were asked by Meeks, and the statement is in Montee's handwriting. The statement consists of four pages. About midway on the second page, appears this sentence: "From this point on I desire to tell the truth about our activities on the night of December 7, 1963." Meeks, Montee and the defendant agree that the defendant started weeping at this point, and that he had been shown a copy of a statement taken from Samson or at least advised as to its contents.

After recounting incidents which have no direct bearing upon the alleged offense, there is included this statement: " * * * by this time I had drank enough beer to be pretty drunk, and I don't remember too much about what happened from this point because beer hits me pretty hard".

The balance of the statement reads in pertinent part:

" * * * after we located Duane at Worden, Louie Rivera, James Samson, Duane Rienke and I went to Ballantine, on the way to Ballantine, Rienke and Louie mentioned breaking into the store at Ballantine. We all thought it would be a good idea. I don't know what time it was, but I think it was after midnight. Duane parked the car. I think Duane Rienke went into the store first through the coal chute. I don't remember of Duane telling us to come on down the chute, but I followed somebody down the chute. I think it was Samson. I remember moving all around in the store, but I can't remember too clearly what happened because I was pretty drunk. Duane and Samson were doing all the searching around in the store. I don't remember, but I think we all tried to break into the safe. We did not get the safe opened. After

we left the store going back out the same way we came in, Louie, Samson and I didn't have anything out of the store, but Duane Rienke said, 'I got something out of the store, anyway'. I think he had several cartons of cigarettes. Then we got in the car and I can't remember what happened until I got out of the car at my home."

It is undisputed that the floor around the safe was covered with white material which came from the lining of the safe. Tracks from this white material led from the safe to the door entering the post office from the store. Deputy Sheriffs Bromgard and Reynolds testified that they had examined defendant's shoes and that it appeared to them that some of the prints had been made by those shoes. On the other hand, Bromgard sent Samson's boot into the FBI Laboratory with a sample of the white material and received a report that it showed evidence of having been in the material. He did not send Morales' shoe for a similar test.

The foregoing facts are undisputed. In addition, the defendant testified that he was told on the afternoon of January 24 that Samson and Reinke had confessed, although neither had done so at that time. This was admitted by the deputy sheriff, who explained that it was a method customarily followed in interrogating those suspected of a criminal offense. The defendant testified further that he was threatened with "Miles City" (the State Industrial School) and promised help if he signed a statement, but this is denied by the interrogating officers. He stated that he refused to sign a statement for the postal inspector.[2]

Two questions arise: (1) whether defendant's statement was given voluntarily; and (2) if so, whether it is sufficient in itself to sustain the charge of juvenile delinquency.

If the defendant were over the age of 18 and charged with the offense which is the basis of the charge of juvenile de-

---

2. Postal Inspector R. E. Parrish took a statement from Samson on January 28, 1964, and witnessed the statement taken from Reinke on the same date.

linquency, and the investigation had been conducted by federal officers, the statement would not be admissible under the rule laid down in Mallory v. United States, 1957, 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479. In that case the Court said:

> "The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. * * * [H]e is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

> " * * * [T]he delay must not be of a nature to give opportunity for the extraction of a confession."

This rule was followed in the recent case of Seals v. United States, D.C.Cir. 1963, 325 F.2d 1006, cert. denied 1964, 376 U.S. 964, 84 S.Ct. 11, 23, 11 L.Ed.2d 982, where a 19 year old high school student was convicted of bank robbery. The Court of Appeals held that the district court erred in admitting a pre-arraignment confession obtained by the FBI after two hours continuous interrogation, even though the suspect, who was told that he was not under arrest, that he had right to counsel and to keep silent, and was free to go at any time, had "volunteered" to go to their office, where he was not told that he was under arrest until after he confessed, since,

in effect, arrest occurred when he entered the FBI office. The court held that a three hour unexplained delay in taking the suspect before a United States Commissioner "was unnecessary and unreasonable" within the meaning of the Mallory Rule.[3]

■ I agree with counsel for plaintiff that in the absence of collaboration, "evidence obtained by state officers, even during a delay which would have violated Rule 5(a) if perpetrated by federal agents, is not inadmissible in federal courts under the McNabb-Mallory Rule." Watts v. United States, 9 Cir. 1960, 273 F.2d 10; cert. den. 362 U.S. 982, 80 S.Ct. 1069, 4 L.Ed.2d 1017.

■ It is recognized also that a proceeding under the Federal Juvenile Delinquency Act results in the adjudication of a status rather than the conviction of a crime, and that the Federal Rules of Criminal Procedure do not apply, "so far as they are inconsistent with the Act". United States v. Borders, N.D. Ala.1957, 154 F.Supp. 214, 216; aff'd, 5 Cir. 1958, 256 F.2d 458.

■ The primary question here presented is whether the defendant was accorded the "due process" and "fundamental fairness" required in dealing with juveniles. In a brief filed in support of their motion to reconsider, counsel argue that "the standards of due process and fairness which govern, or ought to govern, juvenile proceedings are not only not the same standards which govern criminal proceedings, they are not even closely related."[4] While the standards may not be identical, I cannot escape the conclusion that in a proceeding of the nature here involved, due process and

---

3. The court distinguished other cases where the defendants were more experienced or had "prior experience with the criminal law", saying, "Seals was young and still a student".

4. Counsel quote from an article entitled "Constitutional Rights in Juvenile Court" by Judge Paul W. Alexander, 46 ABA Jour. 1206, Nov. 1960. It is clear from Judge Alexander's article that he has reference to a "nonadversary, nonpunitive, solicitous approach" which avoids "the adversary atmosphere" and leaves "little need for the Bill of Rights protection". He suggests that, "In those rare instances where a child does deny involvement an adversary trial is easily arranged." He also recognizes that "while a confession is * * * of consummate importance, it must by all means be voluntary if the court is to be helpful, not merely punitive."

fundamental fairness compel the same safeguards for a juvenile as for an adult charged with the same offense. I agree with the opinion of Chief Judge Forman in Application of Johnson, D.C.N.J.1957, 178 F.Supp. 155, 160 that "the trend in recent decisions is to hold that there shall be no greater diminution of the rights of a child, as safeguarded by the Constitution, than should be suffered by an adult charged with an offense equivalent to the alleged act of delinquency of the child."

There is some uncertainty and conflict in the reported cases with respect to (1) the applicability of constitutional rights, and (2) what constitutes "due process" and "fundamental fairness" in juvenile delinquency proceedings. The conflict is due in part to the nature of the proceedings under consideration in the particular case. A different rule may obtain where a case is disposed of on "a social rather than legal basis", where the proceedings are entirely informal, not open to the public, and essentially nonadversary, from those cases where, as here, the court has the power to deprive the child of his liberty and "the exercise of this power rests upon an alleged violation of the law," and "the court must find, from evidence in a hearing, whether the child has in fact committed an unlawful act." See Shioutakon v. District of Columbia, 1956, 98 U.S.App.D.C. 371, 236 F.2d 666, involving juvenile delinquency proceedings against a minor charged with using an automobile without the owner's consent. In reversing an order denying a motion to set aside an order of commitment, the court held that in cases of this type the juvenile must be advised of his right to counsel and the court must be assured that any waiver is intelligent and competent.[5] While the instant case does not involve the right to counsel, the court's language with reference to the nature of the proceedings is pertinent.[6]

In this case, the proceeding, entitled "United States of America v. Julio Morales" is by "Information, Criminal No. 256", and charges that the defendant on a specified date "did wilfully, wrongfully and unlawfully, * * * commit the offense of juvenile delinquency. Said defendant committed said crime of juvenile delinquency as follows: That on or about the 8th day of December, 1963, at Ballantine, in the District of Montana, Julio Morales, the defendant above-named, did forcibly break into a building known as the Ballantine Mercantile and Post Office used in part as a Post Office of the United States, with the intent to commit larceny in the part of said building so used as a Post Office." As noted supra, an adult was charged with a crime in the identical language of the offense specified in this information as the basis for the charge of juvenile delinquency. The juveniles and adult were interrogated in the same manner by the county officers.

In re Poff, D.D.C.1955, 135 F.Supp. 224, involved an application for habeas corpus, it being alleged that the sentence imposed on the juvenile petitioner was unconstitutional because he was not advised of his right to counsel. It was

5. It is not entirely clear whether the court held that the juvenile had been deprived of his constitutional right to counsel in violation of the Sixth Amendment. The court did cite Johnson v. Zerbst, 1937, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, which is predicated upon the constitutional right to counsel guaranteed by the Sixth Amendment.

6. See also McDaniel v. Shea, D.C.Cir. 1960, 108 U.S.App.D.C. 15, 278 F.2d 460, and article entitled "Should a Right to Assigned Counsel be Established in Juvenile Court Proceedings?" in the Spring, 1964, issue of Juvenile Court Judges Journal, Vol. 15, No. 1, where the author says in part: "In recent years there has been a mounting wave of criticism directed against what appeared to be the insensitivity of the juvenile courts to personal liberties. This has been reflected in an increased number of appellate court decisions which measure juvenile court procedures and determinations, against more rigid standards of basic due process and in the enactment of legislation mandating greater substantial and procedural safeguards for children coming before these courts."

argued that this protection did not extend to juveniles in that the court is non-criminal in nature. In rejecting this contention, the court said:

"But I cannot overlook the ultimate function of the Juvenile Court to determine the guilt or innocence of the individual in order to make an adjudication of whether he is a delinquent.

"The original Juvenile Court Act enacted in the District of Columbia * * * was devised to afford the juvenile protections *in addition* to those he already possessed under the Federal Constitution. Before this legislative enactment, the juvenile was subject to the same punishment for an offense as an adult. It follows logically that in the absence of such legislation, the juvenile would be entitled to the same constitutional guarantees and safeguards *as* an adult. If this be true then the only possible reason for the Juvenile Court Act was to afford the juvenile safeguards *in addition to those* he already possessed. The legislative intent was to enlarge, *not to diminish* these protections." 135 F.Supp. at 225.[7]

The court quoted from Phillips v. State, Tex.Cr.App., 20 S.W.2d 790, 791: "In order that the beneficient purpose of the act may be effectuated, it should be construed liberally, except in so far as it purports to restrain the liberty of the child, in which case it should be strictly construed"; and closed with this language: "Courts should not brush aside lightly the guarantees of the Federal Constitution on some highly technical theory * * *." 135 F.Supp. at 228.

In Pee v. United States, 1959, 107 U.S. App.D.C. 47, 274 F.2d 556, although the language is dictum, the court in effect limited the holding of the Poff case. The court noted that proceedings under the District of Columbia Juvenile Court Act " * * * are not criminal cases. The constitutional safeguards vouchsafed a juvenile in such proceedings are determined from the requirements of due process and fair treatment, and not by the direct application of the clauses of the Constitution which in terms apply to criminal cases. * * * By the same token the Federal Rules of Criminal Procedure do not apply to these proceedings." 274 F.2d at 559.

In Harling v. United States, 1961, 111 U.S.App.D.C. 174, 295 F.2d 161, the Juvenile Court had waived its jurisdiction over appellant and ordered him held for trial as an adult criminal. At trial, testimony of admissions made by appellant while held under authority of the Juvenile Court Act and before that court waived its jurisdiction, was received in evidence. This was held to be error. The court referred to the Pee case and then said:

"It is, of course, because children are, generally speaking, exempt from criminal penalities that safeguards of the criminal law, such as Rule 5, and the exclusionary Mallory rule, have no general application in juvenile proceedings. Aside from the requirements of expressly applicable statutes, the principles of 'fundamental fairness' govern in fash-

7. In United States v. Dickerson, D.C. 1958, 168 F.Supp. 899, 902, Judge Holtzoff in agreeing with Judge Curran, says in part: "Precious constitutional rights cannot be diminished or whittled away by the device of changing names of tribunals or modifying the nomenclature of legal proceedings. The test must be the nature and the essence of the proceeding rather than its title. If the result may be a loss of personal liberty, the constitutional safeguards apply." Judge Holtzoff dismissed an indictment on the ground of double jeopardy. The court of appeals reversed, holding that the "detention hearing" was not an adjudication of such a nature as to constitute jeopardy. The court concluded that since the "Juvenile Court apparently adhered to the protective philosophy of the statute * * *, it is not necessary to consider whether a departure in practice from that philosophy would require the application of procedural safeguards observed in criminal proceedings". 271 F.2d 487, 491.

ioning procedures and remedies to serve the best interests of the child." 295 F.2d at 163.

Application of Johnson, supra, was a habeas corpus proceeding involving a conviction under the New Jersey Juvenile Act. In part it was contended that due process does not apply to a juvenile. The court noted that this contention " * * * must surely have been intended to mean only that the rigor of certain judicial and correctional procedures ordinarily applied in cases of adult offenders, need not be applied in cases of juvenile offenders. It cannot mean that the constitutional protections of *fundamental fairness* are to be constricted. Any other interpretation would do offense to the very concept of liberalizing our criminal procedure in its operation on juveniles. Liberalizing criminal procedure is not intended to be, nor can it be allowed, at the expense of constitutional safeguards." (Emphasis added.) 178 F. Supp. at 160.

The Fifth and Fourteenth Amendments to the Constitution of the United States prohibit the deprivation "of life, liberty, or property, without due process of law * * *." In none of the cases which I have examined has it been held that a juvenile is not entitled to due process. Thus in Pee, although holding that "direct application of the clauses of the Constitution which in terms apply to criminal cases" is not required it was recognized that "due process and fair treatment" are the guides. In appendix A to the Pee case, 274 F.2d at 563, the court noted that cases cited by appellants established "(4) the child involved in a juvenile court proceeding is entitled to due process * * * However, what constituted due process de-

pends on the circumstances of each individual case." In the Harling case, "the principles of 'fundamental fairness' govern * * *.", and in Johnson the argument that due process does not apply to juveniles was answered that "the constitutional protections of fundamental fairness are (not) to be constricted."

In support of the rule that "a child involved in a juvenile court proceeding is entitled to due process", Pee cited In re Contreras, 1952, 109 Cal.App.2d 787, 241 P.2d 631, 634. In this case, involving proceedings under the Juvenile Court Act of California, the court said that, "[I]t cannot seriously be contended that the constitutional guarantee of due process of law does not extend to minors as well as to adults".[8]

Under these and other authorities, the admissibility of defendant's confession depends upon whether it was given under such circumstances that it may be said he was not deprived of "due process" or "fundamental fairness".

Moreover, as Judge Holtzoff said in Trimble v. Stone, D.C.1960, 187 F.Supp. 483, 485, "That these (juvenile) proceedings are to be deemed technically as civil proceedings, is undoubtedly correct, for it has been so held by the Court of Appeals for this Circuit (D.C.). (Citing Pee v. U. S. supra). The fact that the proceedings are to be classified as civil instead of criminal, does not, however, necessarily lead to the conclusion that constitutional safeguards do not apply."

I do not find that the Supreme Court has passed upon the applicability of constitutional guarantees to juvenile proceedings or has considered under what circumstances confessions may be received in evidence against a juvenile in pro-

---

8. The court said further:

"While the juvenile court law provides that adjudication of a minor to be a ward of the court shall not be deemed to be a conviction of crime, nevertheless, for all practical purposes, this is a legal fiction, presenting a challenge to credulity and doing violence to reason." * * *

"True, the design of the Juvenile Court Act is intended to be salutary, and every effort should be made to further its legitimate purpose, but never should it be made an instrument for the denial to a minor of a constitutional right or of a guarantee afforded by law to an adult." (241 P.2d at 633) This portion of the Court's opinion was quoted with approval in In Re Poff. (135 F.Supp. at 226).

ceedings under the Juvenile Delinquency Act. The Court has, however, referred repeatedly to the fact that youth and inexperience must be considered in determining whether any confession is voluntary. A leading case is Haley v. Ohio, 1948, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, where a 15 year old boy was convicted of murder in an Ohio court. A confession, purported to have been voluntarily made after advice to the defendant of his right to remain mute, was received in evidence. While the facts in that case are clearly distinguishable, the language used by the Supreme Court in reversing the conviction is indicative of its grave concern that fundamental fairness and due process be accorded to children. The Court said:

> "We do not think the methods used in obtaining this confession can be squared with that due process of law which the Fourteenth Amendment commands.
>
> " * * * Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. * * *
>
> "But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty

form of the due process of law for which free men fought and died to obtain." 322 U.S. at 599–601, 68 S.Ct. at 303–304.

The Haley case was followed in Gallegos v. Colorado, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, where a fourteen year old boy and another juvenile assaulted an elderly man and stole $13.00 from his pockets. Picked up twelve days later by police, the boy admitted the assault and robbery. He was convicted in a "juvenile court" of "assault to injure" and committed to the state industrial school. Subsequently the victim died, and the boy was charged with first degree murder and convicted in a state court. The crucial question before the Supreme Court was the admissibility of a formal confession which the boy made five days after his arrest.

After reviewing the facts set forth in both the Court's opinion and the dissenting opinion by Mr. Justice Clark, it appears that circumstances in the Gallegos case were less favorable to the accused than in the instant case. While the formal written confession was taken five days after the arrest, it appears from the dissenting opinion that "spontaneous oral admissions were made by the petitioner at the time of arrest on January 1, as well as a detailed confession the next day, all long before the formal confession was given five days later." The minority opinion did not feel that "Gallegos' case is in anywise in the same footing with Haley v. Ohio".

The majority opinion, however, concluded that even under these circumstances the confession was obtained in violation of due process, saying in part:

> "The prosecution says that the youth and immaturity of the petitioner and the five-day detention are irrelevant, because the basic ingredients of the confession came tumbling out as soon as he was arrested. But if we took that position, it would, with all deference, be in callous disregard of this boy's constitutional rights. * * * A lawyer or an adult relative or friend could have

given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had." (370 U.S. p. 54–55, 82 S.Ct. p. 1212–1213.) [9]

I do not find any cases involving the precise situation here presented, i. e., where a statement taken by county officers under a state juvenile act [10] is offered in evidence in a proceeding under the Federal Juvenile Delinquency Act. Insofar as due process and fundamental fairness are concerned, however, it appears to me immaterial whether the statements are taken by federal or state authorities, and whether they were taken for proceedings in a juvenile court or for a criminal prosecution.

In their reply brief, counsel for plaintiff argue that the cases arising under the District of Columbia Juvenile Act are distinguishable. It is true, as counsel point out, that under the Federal Juvenile Delinquency Act, a charge against a juvenile is instituted and prosecuted in the same manner and under the same rules as a charge against an adult until such time as the accused elects to be treated as a juvenile offender. Under the Juvenile Court Act of the District of Columbia, a child is proceeded against non-criminally until such time as the juvenile court waives its jurisdiction, whereupon he is proceeded against criminally in the same manner as an adult. Hence, contend counsel, even though the statement might not be admissible in a criminal prosecution, it is admissible in this juvenile delinquency proceeding.

If we were to follow the rule for which the government in effect contends, i. e., that a statement inadmissible in a criminal proceeding might properly be used in a juvenile delinquency proceeding, then the accused should be advised of this possibility when he makes his election to be tried under the Juvenile Delinquency Act.[11] Morales was advised of his rights when he made his election, but this possible waiver of a right was not mentioned.

Significant factors in determining whether Morales' statement was voluntary [12] include the following: The defendant is a sixteen year old boy of Mexican descent, who lives at home with his mother and several brothers and sisters. He is a freshman in high school. He denied any participation in the alleged offense on December 9, 1963, and again on January 24, 1964, both before and after being taken into custody. During the interrogation on January 24 he was informed by the officers that they

---

9. It is recognized that these Supreme Court cases did not involve juvenile delinquency proceedings. They are cited to show the concern of the Court that due process and fair treatment be accorded youthful offenders, and that youth and inexperience must be considered in determining whether a confession is voluntary.

10. It is unnecessary to consider whether there was compliance with the Montana Juvenile Delinquency Act, and particularly with section 10–609, R.C.M.1947, providing that "when a delinquent child is taken into custody, 'the officer taking the child into custody shall *immediately* report the fact to the court and the case shall then be proceeded with as provided in this act.'" (Emphasis added.)

11. 18 U.S.C.A. § 5033 provides in pertinent part: "The consent required to be given by the juvenile shall be given by him in writing before a Judge of the District Court of the United States having cognizance of the alleged violation, who shall fully apprise the juvenile of his rights and of the consequences of such consent."

12. I have not considered it necessary to analyze other recent decisions of the Supreme Court which have considered the admissibility of confessions alleged to be involuntary. See, in particular, Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, and cases there cited, including Blackburn v. Alabama, 1959, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. See also Jones v. United States, D.C.Cir., 232 F.Supp. 585, 1964.

had obtained statements from Samson and Reinke which implicated him. This was not a fact. After being confined in jail overnight, he was interrogated again by two officers. That portion of the statement which implicates him was admittedly made after he broke down and wept and after he had been shown a statement given by Samson. Between the time he was interviewed the preceding afternoon and the signing of the statement he had not seen any relative, friend or lawyer. He claims that he was thoroughly frightened at the time the confession was made. At least he was emotionally upset.

Two days later Morales refused to give a statement to the postal authorities when they questioned him. On the stand he denied any participation in the alleged offense. In the Gallegos case, the defendant had orally admitted the offense from the time he was first taken into custody. Here the defendant made the admission only at the interrogation on January 25, and at all other times has denied the offense.

▆ Under these circumstances I cannot hold that the confession was freely made while Morales was afforded all of the requisites of due process required in the case of a sixteen year old boy of his experience.

There is some question also whether the confession is sufficient in itself to justify a conviction for entering the post office with intent to commit larceny therein. All that Morales said relative to his presence in the post office is as follows:

> "I remember moving all around in the store but I can't remember too clearly what happened because I was pretty drunk. * * * I don't remember but I think we all tried to break into the safe. We did not get the safe open."

The last two sentences are the only connection between Morales and the post office. He was pretty drunk and he can't remember, but he thinks they all tried to break into the safe.

The only other competent evidence against Morales is the testimony of Deputy Sheriffs Bromgard and Reynolds that they thought some of the tracks in the post office were made by Morales' shoes. They did not, however, send Morales' shoes into the FBI for checking, as they did with Samson's boots. Little weight accordingly may be attached to their suppositions.

Had Samson testified in accordance with his signed statements, both Reinke and Morales would have been found to be juvenile delinquents. Those statements, however, may not be considered against either Reinke or Morales. I have reluctantly concluded that I must grant Morales' motion for acquittal.

▆ I hope that the boys and their parents will not feel that this decision in any way vindicates or condones their conduct. Under the testimony of Samson and Morales, the four boys were out most of the night, driving around in a car and consuming a substantial amount of beer. Even accepting their stories on the stand as true, their conduct was certainly of such a nature as to arouse the suspicion of law enforcement officers. In each case there is a total lack of adequate parental supervision and a proper sense of responsibility on the part of both the boys and their parents. They have escaped punishment on this occasion through insufficient evidence to warrant their conviction. It is not unlikely however, that they will be in trouble again, unless as a result of this incident there is a change in attitude and conduct on the part of both the boys and their parents.